*Decision will be entered under Rule 155.*

RICHARD T. SNYDER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5950-82.     Filed April 2, 1986.

*Ralph S. Boggs*, for the petitioner.
*Fera Wagner*, for the respondent.

COHEN, *Judge*: Respondent determined deficiencies of $12,855 and $28,482.51 in petitioner's Federal income taxes for 1978 and 1979, respectively, and additions to tax under section 6653(a)[1] of $642.75 and $1,424.13, respectively, for those years. By amendment to the answer, respondent seeks additional interest under section 6621(d) on the ground that the deficiency for the year 1979 is attributable to a valuation overstatement within the meaning of section 6659(c).

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

The deficiency for 1978 arose out of respondent's disallowance of a deduction claimed under section 617 for a payment to Einar Erickson, an "exploration geologist." The deficiency for 1979 resulted from disallowance of a claimed charitable contribution deduction for donation of a mining claim to a qualified charity.

### FINDINGS OF FACT

Some of the facts have been been stipulated, and the stipulation of facts is incorporated herein by reference. Petitioner was a resident of Toledo, Ohio, at the time he filed his petition herein. He timely filed individual income tax returns with the Internal Revenue Service Center at Cincinnati, Ohio.

At all times material hereto, petitioner was an officer and owner of a company involved in custom molding of steel. Petitioner did not have any experience with silver or other precious metals.

During 1978, petitioner consulted with Roy Higgs (Higgs) about life insurance and estate planning. Higgs mentioned to petitioner investments in mining claims promoted by Einar Erickson (Erickson). Higgs explained the purported tax benefits of investments with Erickson, to wit, that money paid to Erickson could be deducted as "exploration expense" and that a mining claim obtained from Erickson could be donated to charity, thus leading to an additional deduction in excess of the amount paid.

Petitioner received from Erickson a two-page document entitled "Client Benefits for Hiring the Professional Services of an Exploration Geologist." Those purported benefits were described as follows:

1. Such exploration activities and expenditures are 100% tax deductible for all such fees paid for exploration in the calendar year expended:

SEE: Internal Revenue Code Section 617: also note 613 Revenue Rule 70-287.

ADDITIONAL HELPFUL INFORMATION: Commerce Clearing House 1975 Standard Federal Tax Reports Paragraph 3580 A; Commerce Clearing House, 1976 Federal Tax Course page 1419; Prentice-Hall, Inc. Internal Revenue Code 1954 (I.R.C.) page 25,274.

2. Client will have staked in his name one or more twenty acre "Lode Mining Claims" as the normal results of exploration activities in a

mining district or mineralized region. Please note the STANDARD EXPLORATION AGREEMENT. This outlines the terms of the working arrangement. *Item 7 states the geologist will retain no interest in the claims staked for the client. Each client has total control and autonomy as it relates to his exploration activitity [sic] and any claims.* Over the years clients have asked what they could do with their claims. Listed below are some alternatives that a client might consider:

a. Donate some or all of the mineral claims that the client may have had staked in his name to a qualifying charitable institution. It is suggested that only appreciated capital gains property that qualifies under long term holding rules be so donated. The client can contact the gift officer of most such charitable institutions to obtain information about their requirements. Many have Directors of Mineral Development or offices that accept properties of merit. The Benefits to be derived from such a donation may be seen by examining the material listed as follows:

See: Internal Revenue Code Section 170

Additional helpful information: Commerce Clearing House paragraphs 1860 and 1862:

REGULATION - PARAGRAPH 1.170-1; Commerce Clearing House, 1976 Federal Tax Course page 919. Prentice Hall, Inc. Internal Revenue Code of 1954 (I.R.C.) 25,120.15. CARRY-OVER PROVISIONS - See Internal Revenue Code Section 170 (d). Additional helpful information: Commerce Clearing House 1975 Standard Federal Tax Reports paragraphs 1860 and 1863K,

REGULATION: Paragraph 1.170A-10; Commerce Clearing House 1976 Federal Tax Course page 921; Prentice-Hall, Inc. Internal Revenue Code of 1954 (I.R.C.) 25,120.21

b. The client may retain some or all of the mineral properties. If a client were to choose this alternative in the second year of retention, $100 worth of assessment work has to be done and filed for each 20 acre claim. For more information on this, the client could contact any geologist and work out the long range program of retention of any claims and on-going work.

If the client retains his properties there are several other possibilities.

1. The client could then expend additional funds for exploration under I.R.C. code Section 617.

2. Hold the properties for the future.

3. Donate in the future — see above, obtain advice of accountant or tax attorney.

4. Sell.

5. Lease.

6. Joint-Venture.

7. Continue to expend funds to prove out additional merit of the property.

8. Hold property and watch developments in the region to ascertain possible disposition of properties.

9. Develop property when merit has been established.

c. Sell some or all of the mineral properties to a mining and development company, a private individual or others.

d. Lease some or all of the mineral properties to a mining or development company, a private individual, or others. Under this arrangement the Client may elect to take any lease payments in bullion silver. See IRC Section 613.

(*All of the above decisions to be made by the client. Geologist retains no interest in any claims located for clients.*)

3. Any communications with geologist, field visits, or other, as a professional meeting would be tax deductible.

4. The Client may wish to participate in future exploration projects.

The Client should check with and obtain the expert advice of accounting advisors and or tax attorneys for other alternatives and flexibilities such exploration activities provide and in the evaluation of all of the above.

[Emphasis supplied.]

Erickson and petitioner executed an undated document, entitled "Consultant Geologist Standard Exploration Agreement," stating:

The undersigned Consultant Geologist [Erickson] agrees to accomplish the desired exploration activities and geological services and will:

1. During the course of exploration activities locate and stake Lode Mining claim, or claims, for client on any mineralized ground that may be found, or related and associated ground.

2. Record the Certificates of Location for any claims staked, and prepare and record a Claim Map, and have these filed with the County Recorder and the Bureau of Land Management.

3. Provide a progress report or reports of exploration activities performed, recognizing the high degree of risk attendent to exploration activities and non-discovery of commercial ore; and unless notified in writing to the contrary I may provide data for other clients since I may be doing work for others in the same mining region.

4. Provide an accounting of exploration expenditures for client or his accountant as may be desired, and provide receipts for geological services and a STATEMENT for the amount of expenditures made and work done.

5. Prepare a final geological report, or summary, of results of explorations on clients properties, and if not otherwise restricted, data on regional work. And, if desired, arrange for an independent geological report of final results by a recognized geologist.

6. Compile maps of geological work performed, which may include drilling, assaying, geological work, petrographic data, mapping, and any other work that may be completed for client, to the extent of funds provided, on any claims and hold this information confidential unless permitted by client to distribute it otherwise.

7. *I will not retain any interest in the Lode claims, if any, or any claims located by or for client.*

8. Upon 30 days notice, client may terminate my services, and if monies were advanced, any unspent funds will be returned to client, and should client replace me by another geologist, which he may do so, I will provide file data and all work completed to that point and help in any transition.

9. Conduct client or his agent over project area as may be arranged during field work and exploration activities.

[Emphasis supplied.]

In late October 1978, petitioner requested that Ross Edwards (Edwards), a sales representative for petitioner's company, meet with Erickson and discuss the investment. Although Edwards had obtained a Bachelor of Science Degree in Geological Engineering in 1940, he had not worked in mining after 1941. On October 31 and during the first couple of days of November 1978, Edwards met with Erickson in Las Vegas, Nevada. He spent several days with Erickson and Erickson's associates, looking at various literature, photographs, and maps provided by Erickson. Edwards did not consult with anyone involved in mining who was not connected with Erickson. Edwards returned to Toledo and reported to petitioner.

Under date of September 1, 1978, Erickson billed petitioner:

FOR: PRELIMINARY GEOLOGICAL SERVICES AND EXPLORA-
TION RENDERED ON AND/OR AROUND THE FOLLOWING
CLAIM:

Quartz Mountain Claim Group

LOCATED IN THE Quartz Mountain     MINING DISTRICT
COUNTY OF: Nye                     NEVADA
TOTAL: $25,000

That statement bore a notation "TO CORRECT ORIGINAL STATEMENT 11/1/78."

On November 10, 1978, petitioner sent a check for $25,000 to Erickson. Edwards also sent $25,000 to Erickson.

Petitioner subsequently received from Erickson four documents entitled "Certificate of Location of Lode Mining Claim" containing the following information:

| Description of claim | Date of location | Date of recordation |
|---|---|---|
| Quartz Mtn. #215 | 26 Sept. 1978 | 11/10/78 |
| Quartz Mtn. #216 | 26 Sept. 1978 | 11/10/78 |
| Treasure Hill #307 | 21 Nov. 1978 | 12/19/78 |
| Treasure Hill #99 | 27 Nov. 1978 | 1/10/79 |

During the late 1970's, Erickson staked over 5,000 mining claims in widely separated areas of the State of Nevada. The claims were structured by Erickson into eight individual mining projects. The claims described as Quartz Mountain 215 (QM 215) and 216 are a part of Erickson's so-called Quartz Mountain mining project. The claims described as Treasure Hill 99 and 307 were part of Erickson's Treasure Hill mining project. The Quartz Mountain project consisted of over 400 claims located in nine separate geographic areas containing different types of mineralization in each different area.

Erickson divided his various projects into so-called "A" claims and "B" claims. Claims designated "A" claims supposedly had physical evidence of mineralization. There were approximately 210 claims in the Quartz Mountain project that were designated by Erickson as "A" claims. QM 215 was designated an "A" claim.

Prior to June 1985, neither petitioner nor Edwards ever physically examined the claims purportedly staked on their behalf by Erickson.

Petitioner never requested a specific accounting from Erickson for the $25,000 paid to Erickson. Part of that money was spent on activities in relation to other mines leased by Erickson and known as the Bay State and San Rafael mines. Petitioner had no operating interest in either of these properties. Five thousand dollars was paid by Erickson to Higgs for referring petitioner to Erickson. That fee was among other fees paid to Higgs for referring investors to Erickson. Higgs visited the mining areas on various occasions for his own purposes but did not render any exploration services. Some of the funds received by Erickson were paid to Dr. Mead Jensen for appraisals of the claims, as discussed below.

All claims in the Erickson mining projects, including the ones obtained by petitioner, were staked by Erickson's younger brother, Lynn Erickson (L. Erickson). L. Erickson staked an average of 10 claims a day in the Quartz Mountain mining project. The usual cost of staking, mapping, and recording a claim such as petitioner's is approximately $100.

On September 1, 1979, Erickson prepared and sent to petitioner a letter in which Erickson valued QM 215 at "not less than: $275,000.00." On December 20, 1979, petitioner donated QM 215 to the Maumee Valley Country Day School (the school). His counsel notarized the quit claim deed from petitioner to the school.

On his 1978 tax return, petitioner deducted $25,000 as exploration expense. On his 1979 tax return, petitioner claimed a charitable contribution deduction of $56,568.86, reflecting the donation of QM 215. This amount was determined by subtracting the $25,000 exploration expense previously deducted from the $275,000 value placed on the claim by Erickson, and limiting the deduction to 30 percent of petitioner's adjusted gross income. No other charitable deductions were claimed by petitioner on his tax returns for 1978 or 1979.

The school acknowledged petitioner's gift in its annual statement for 1979 and thereafter listed the claim as an asset of the school's endowment fund at a value of $1. The school never incurred any expense in relation to the claim and never received any benefit from it. On August 17, 1981, in the presence of petitioner's counsel, the school, as claim holder, entered into an agreement with Silver International, Inc., with respect to development of the so-called Quartz Mountain project. The agreement was signed by Erickson as President of Silver International, Inc. The school did not maintain a copy of that agreement in its records.

Erickson's opinion that QM 215 was worth not less than $275,000 was based on a theory of "consolidation" that is not generally recognized in the hard metals mining business. Persons owning mining claims may consolidate or pool adjoining claims to avoid litigation arising over the right to follow a vein of ore from the surface to its depth, with all of its dips, spurs, or angles. Consolidation of adjoining mine

workings may also occur when owners join together to conduct business operations where they have compatible assets to contribute, e.g., an operational tunnel, an ore deposit, equipment, or other known assets. Essentially Erickson's theory is that claims of the investors in his various projects may be joined together and valued on the basis of the total ore in other areas in Nevada controlled by him through staking of claims or through leases. The areas joined by such method are selected solely by Erickson and are not necessarily contiguous or even near each other.[2] No investor in Erickson's projects is required to participate in the consolidation.

Erickson had extensive training in geology, archaeology, mining engineering, business, bookkeeping and accounting, business organizations, and general physical sciences. He taught economic geology at Brigham Young University and other subjects there and at other institutions. In 1954, he began exploring for silver in Nevada and Utah. During the 1950's he leased rights to operate the Bay State Mine. He was employed by various companies as a consultant in exploration geology. Erickson began exploration in the Quartz Mountain region in 1956 or 1957. He examined the area where QM 215 was staked a number of times in 1959 and thereafter. By 1959, various smelters receiving ores in the general area of Quartz Mountain had shut down. Nonetheless, Erickson decided to proceed with operations at the San Rafael Mine. He leased rights to that mine during the 1960's. Between 1966 and 1976, he secured loans from the Federal Government in relation to exploration for gold and silver. Prior to 1976, the Federal Government provided 75 percent of the cost of exploration on approximately 30

---

[2]Erickson described his theory as follows:

Q. Could you explain to the Court what has been referred to as Erickson's concept of consolidation? Could you explain to the Court what this term means as far as a mining operation is concerned?

A. Yes. As soon as you have one claim against another, you have an association of claims by virtue of contiguous borders. When you put a number of claims in a group, then you've got a grouping, and as you try to cover the favorable areas in a particular mining district or region, then you have a much larger group. When you've assigned to that group the favorable ground and the activities in which you're engaged, then you have a consolidation. The expenditures of the individuals who are staking the claims make that an absolute consolidation.

test holes, some to depth of nearly 1,300 feet, in the Quartz Mountain region of Nevada.

Erickson's opinion of the valuation of QM 215 was based in part on his experience with the San Rafael Mine and in part with mineralization discovered in the Downeyville area, a couple of miles south of the San Rafael Mine. The only work done in the area specified as QM 215, however, was done in approximately 1910. No exploration work was done on QM 215 at any time relevant to this case. Samples from QM 215 were taken in 1985 preparatory to trial of this case. The opinion of three experts other than Erickson was that QM 215, standing alone, had no value.

The standard documents executed by investors in Erickson Mining programs, including petitioner, as described above, expressly disavowed any continuing interest of Erickson in the claims staked for investors. Starting in 1980, subsequent to a grand jury investigation into Erickson's activities, Erickson, through Silver International, Inc., began entering into agreements such as the August 17, 1981, agreement entered into with the school, described above. Similar agreements were entered into by petitioner with respect to the other claims obtained by him from Erickson.

At the suggestion of Erickson, petitioner employed Dr. Mead Jensen (Jensen), a Professor of Geology at the University of Utah, to evaluate QM 215. Jensen received a Ph.D. in geology from the Massachusetts Institute of Technology in 1951. He taught at Yale University for 14 years. Prior to 1977, he published numerous articles on geological subjects. Commencing in about 1977, Erickson employed Jensen to perform certain geological work and make evaluations for Erickson's investors. Jensen was paid approximately $300 per day in consulting fees from funds provided by the investors in Erickson projects. Jensen visited QM 215 on various occasions and collected samples. He concluded that the claim standing alone had no value. He did, however, arrive at values in excess of $300,000 for QM 215, applying Erickson's consolidation theory. Jensen treated the Bay State Mine, located at least 120 miles from

QM 215[3] and the San Rafael Mine, located 5 miles north of QM 215, as a unit, although Erickson did not own or control the total area between these mines. Jensen projected receipts for each mine using figures obtained from a report commissioned by Erickson and obtained from Erickson's files, without making any allowances for inflation or for changes in operating conditions and without independently verifying any of the assumptions. He then divided the total anticipated net operating receipts for 10 years by 210 Quartz Mountain "A" Claims.

Respondent employed Reb Bennett (Bennett) to examine QM 215. At San Jose State University, Bennett earned bachelor's and master's degrees in geology with emphasis on mineralogy and economic geology, which is the study of ore deposits. Bennett was employed by the Bureau of Land Management (BLM), where his primary function was to evaluate mineral potential of BLM lands and to determine the value and validity of unpatented mining claims under U.S. mining laws. (Unpatented claims are on land owned by the Government. The claim holders, such as petitioner, have the right to exploit any minerals in the claim areas.) Bennett concluded that QM 215 had no value. He also concluded that the claim was invalid under the requirements of the Federal mining laws as of December 20, 1979, the date of donation.

Respondent also employed Dr. Anthony Payne (Payne) to evaluate QM 215. Payne received bachelor's and master's degrees in geology at the University of Utah, with emphasis on mineralogy and mining engineering. After obtaining experience in industry he obtained a Ph.D. in economic geology at Stanford University in 1959. Payne taught at the Mac Kay School of Mines in Reno, Nevada, and conducted mining operations on his own account. From 1979 through the date of trial, Payne, in addition to engaging in exploration geology for his own account, was employed by the Internal Revenue Service as an independent consultant to investigate all of the Erickson projects. Payne specifically examined QM 215 and concluded that it

---

[3]Erickson testified that the distance was 200 miles. Jensen once testified that the distance was 40 miles and another time said it was 120 miles.

had no value. He reached similar conclusions with respect to all of the Erickson claims examined by him.

### ULTIMATE FINDINGS OF FACT

The $25,000 sent by petitioner to Erickson in 1978 paid for staking, mapping, and recording four claims acquired by petitioner, the cost of which was approximately $100 per claim. The $25,000 payment was primarily made for appraisals and anticipated tax benefits and other services not constituting exploration expenses within the meaning of section 617.

As of December 1979, Quartz Mountain Claim 215 was economically useless and had no fair market value.

Petitioner knew or should have known that he was not entitled to the deductions in issue in this case.

The value claimed to support the charitable contribution on petitioner's 1979 tax return far exceeded 150 percent of the correct value of Quartz Mountain Claim 215, and that valuation overstatement resulted in a substantial underpayment attributable to a tax-motivated transaction.

### OPINION

Petitioner has the burden of proving that the statutory notice of deficiency is incorrect in disallowing the claimed exploration expense and charitable contribution deductions and in determining additions to tax for negligence. *Welch v. Helvering*, 290 U.S. 111 (1933); *Bixby v. Commissioner*, 58 T.C. 757 (1972). Because the additional interest under section 6621(d) was raised by an amendment to the answer, respondent has the burden of proving that there was a substantial underpayment in the year 1979 attributable to a tax-motivated transaction, that is, that the value claimed for QM 215 exceeded 150 percent of the correct value of that claim on the date that it was donated to the Maumee Valley Country Day School. Secs. 6659(c), 6621(d). There is no dispute that the claim was actually given to the school and that the school was a qualified charity for purposes of section 170. The parties also agree that the fair market value is defined as set forth in section 1.170A-1(c)(2), Income Tax Regs., as follows:

The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * *

### The $25,000 Payment

Section 617 allows a deduction for certain mining exploration expenditures, including:

expenditures paid or incurred during the taxable year for the purpose of ascertaining the existence, location, extent, or quality of any deposit of ore or other mineral, and paid or incurred before the beginning of the development stage of the mine * * *

Expenses paid or incurred for the development of a mine or other natural deposit, if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed, are deductible under section 616(a). *Anderson v. Commissioner*, 83 T.C. 898 (1984), on appeal (10th Cir., Mar. 5, 1985). Sections 616 and 617 express the intent of Congress to allow the deduction of expenditures reasonably connected with preparations for extracting ore. See *Estate of DeBie v. Commissioner*, 56 T.C. 876, 892 (1971),[4] dealing with the predecessor of section 617. There are few guidelines provided to define further "exploration expenditures," and this case does not require that we attempt to provide a comprehensive definition that would serve all purposes. The costs of staking, mapping, and recording a claim would be excluded from deductible expenditures as the costs of acquiring the claims. See sec. 1.617-1(b)(4), Income Tax Regs. Further, the substantial amounts paid by petitioner and spent by Erickson as part of the $25,000 are not exploration expenditures.

Erickson billed petitioner $25,000 for what Erickson referred to as "exploration expenditures," and petitioner deducted the full amount on his tax return as allegedly paid for such purpose. Neither petitioner nor Erickson, however, identified any services reasonably connected with preparations for extracting ore other than staking, mapping, and recording the claims allegedly located for petitioner by Erickson. From the testimony of Erickson and his brother,

---

[4]See also *Baxter v. Commissioner*, T.C. Memo. 1985-415; *Kilroy v. Commissioner*, T.C. Memo. 1980-489; *Kilroy v. Commissioner*, T.C. Memo. 1973-7.

L. Erickson, who actually did the staking, mapping, and recording, however, it is apparent that no new exploration was conducted in the Quartz Mountain area in 1978. They merely staked claims on areas that had been known to Erickson over the prior 30 years. Respondent's experts testified positively that no exploration work was done on petitioner's claims.

The true purpose of the $25,000 payment made by petitioner to Erickson is apparent from the document delivered by Erickson purporting to set forth the "client benefits" to be obtained. Those benefits are almost exclusively anticipated tax benefits. The first alleged benefit is that the expenditures "are 100% tax deductible." The first suggested use of the claim is donation to a charity, and it is suggested "that only appreciated capital gains property that qualifies under long term holding rules be so donated." Other tax benefits are set forth in the list of "client benefits." Noticeably absent from the purported benefits is any reasonable program for exploitation of any ore potential of the claim.

Other evidence explains the application of the $25,000 payment by Erickson. First, Higgs, the insurance and estate planning consultant who referred petitioner to Erickson, received $5,000. He testified that he had received fees for referring numerous clients to Erickson, which ranged from $5,000 to $10,000. Higgs did visit the Nevada mining area on various occasions, but he did so on his own account and performed no services that could reasonably be described as exploration. Second, Jensen testified that he received payments for appraisal services and that he was told by Erickson that those payments came from investors in the Erickson programs. Third, Erickson used funds received from the investors to finance his own operations throughout the Nevada mining areas. Thus Erickson did not in fact use the moneys received from petitioner for exploration on behalf of petitioner.

Petitioner, on the other hand, showed no interest in bona fide exploration or mining operations. He did not personally talk to Erickson or ask Erickson for a specific accounting as to how his $25,000 was spent. He claims he relied on the expertise of Edwards, whose relevant training and experi-

ence occurred more than 35 years earlier. Neither petitioner nor Edwards consulted anyone independent of Erickson. Although petitioner claims to have considered the per ounce value of silver on the commodities market in evaluating the prospects of his investment, he obtained no specific information as to whether there was any correlation between the value of a lode mining claim in Nevada and the price of silver on the commodities market. The record discloses none, and respondent's expert testified that there is none.

The most credible part of petitioner's testimony was his candor in admitting that he considered the tax aspects of the investment, as follows:

The other consideration I had in mind in '79 when I was evaluating this is that again in '78 it was brought up that there was a potential for donation and tax write-off. Well, that was presented to me as a pro, as an advantage, as an incentive. But when I'm taking my own counsel, I had to think if it's got an advantage, it's got to have a disadvantage. And at that time the disadvantage that I saw was a donation would automatically in my layman's understanding be considered a tax shelter, and at that particular time due to the research just out of curiosity I myself did as a businessman —I was well aware that the IRS took a rather dim view of, "tax shelter situations," and under that premise, I had to make the evaluation what danger, what would happen.

Consequently, therefore, I worked out a little rule for myself when I got the claim in '78 when I bought it: You let it ride; if something comes out of it the next two or three years, or if something doesn't come out of it, you still got it there. That was on the major portion of my evaluation.

Second, I addressed myself to this tax shelter situation, and being not exactly always sympathetic to the views of the IRS, why, I had to take a very careful consideration here. My consideration is as follows: Silver — I looked at this —this didn't take a great deal of research —silver was running from 1970 to by the time I was looking at this situation, between $1.60 and I'd say $5.60. So from my rule of thumb involving this situation, I said, "That's about three, three-and-a-half times in eight years that it has increased, increased normal situation, going up and dropping a little bit, coming back, but always on the upgrade." So I felt that this was a pretty stable market and that there was just as good a chance that silver was going to increase that same proportion in the next five or six years as there was that it wasn't.

So I said, "All right. I'll mark my evaluation as $6.00 an ounce, and whatever an A-claim, which would be the only one I would be considering taking —if an A-claim came up and if silver tripled in its value from six to 18, then I would have the positive side of my option in donating." My reasoning was, ironic —my reasoning was that if there was triple the value of the claim I donated, I would not be where I am today, defending my donation in a court of law against the IRS evaluation.

And by the time this '79 situation came along, I did have two A-claims. I ended up —one or more —I ended up with two A-claims.

And so after I made this evaluation, had Edwards check, and it looked like there was more action on Treasure Hill as far as getting closer to putting in a mining claim and actually bringing the silver out. So I kept Treasure Hill, and I donated Quartz Mountain 215.

Several things are apparent from petitioner's testimony. First, his tax strategy was paramount. Second, he was aware that the purported value of the claims was totally speculative. Third, he was aware that there was no immediate value in QM 215, and no computation considered by him justified the value ultimately claimed on the tax return. He assumed that the price of silver might increase as much as 3½ times in 5 or 6 years. Yet he claimed a value after 1 year that was 10 times the amount he spent on four claims.

Further, on the entire record, it is not reasonable to believe that petitioner would acquire property in order to make a $250,000 gift, or any valuable gift, to the school for any reason other than a tax deduction. Petitioner's tax returns do not reflect a single donation other than the one in issue here, much less a pattern of charitable giving. The only indication of a relationship between petitioner and the school is through his counsel, who notarized the quit claim deed to the school and who asserted during trial that he was present when the representative of the school executed the 1981 agreement with Silver International, Inc. The claimed deduction, therefore, must be regarded as an integral part of the original plan and as a major consideration for petitioner's payment to Erickson.

All of the foregoing reasons, therefore, compel the conclusion that petitioner's payment of $25,000 to Erickson was primarily, if not exclusively, for anticipated tax benefits. Such payment was not for exploration services. Moreover, the payment is not deductible under any other provision of the Code. See, e.g., *Knetsch v. United States*, 364 U.S. 361 (1960); *Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 210 (1983)*, affd. on this issue 752 F.2d 89, 95 (4th Cir. 1985); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1243 (1981). As stated by the Court of Appeals for the Seventh Circuit—

The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future. [*Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983).] [5]

## Valuation of QM 215

Erickson, Jensen, Bennett, and Payne were all qualified by education and experience to express opinions on geological subjects. Yet the only area of agreement found among experts for the opposing parties was that Jensen, Bennett, and Payne all agreed that QM 215 had no value without giving effect to Erickson's theory of consolidation.

Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. Such evidence must be weighed in light of the demonstrated qualifications of the expert and all other evidence of value. *Estate of Christ v. Commissioner*, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. *Kreis' Estate v. Commissioner*, 227 F.2d 753, 755 (6th Cir. 1955); *Tripp v. Commissioner*, 337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or reject

---

[5]Or, as stated by the Court of Appeals for the Fourth Circuit in *Barnard v. Commissioner*, 731 F.2d 230, 232-233 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1983):

"The long and the short of it all is that parties demeaned themselves in entering so dishonest a venture, unquestionably structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of any realistic business purpose. In this case we confront only risk-takers who believed they proceeded on a no-loss path; if they got away with it, well and good from their misguided point of view, and, if they did not, they would be no worse off than had they never sought the unjustified benefits in the first place. We refrain from any expression of opinion as to whether the taxpayers have exposed themselves to the risk of criminal prosecution. However, even assuming that perhaps they have not, they, by their conduct, nevertheless reveal a malaise which a healthy United States of America cannot sanction. It is a frightening prospect when our wealthy citizens, those in the highest income tax brackets, seek to take indefensible advantage of the country and their fellow citizens, especially those who have far less from which to meet their tax responsibilities. [Fn. refs. omitted.]"

expert testimony, whichever, in our best judgment, is appropriate. *Helvering v. Nat. Grocery Co.*, 304 U.S. 282 (1938); *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; *In re Williams' Estate*, 256 F.2d 217, 219 (9th Cir. 1958), affg. a Memorandum Opinion of this Court. Thus we have rejected expert testimony where the witness' opinion of value was so exaggerated that his testimony was incredible. See *Chiu v. Commissioner*, 84 T.C. 722 (1985); *Dean v. Commissioner*, 83 T.C. 56, 75 (1984); *Fuchs v. Commissioner*, 83 T.C. 79, 99 (1984).

In *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980), we stated:

We are convinced that the valuation issue is capable of resolution by the parties themselves through an agreement which will reflect a compromise Solomon-like adjustment, thereby saving the expenditure of time, effort, and money by the parties and the Court—a process not likely to produce a better result. Indeed, each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. If the parties insist on our valuing any or all of the assets, we will. We do not intend to avoid our responsibilities but instead seek to administer to them more efficiently—a factor which has become increasingly important in light of the constantly expanding workload of the Court.

That language should not be misinterpreted, as some litigants apparently have, as expressing an intention of the Court to sanction a party who takes an unreasonable position. See, e.g., the argument of the taxpayer in *Estate of Kaplin v. Commissioner*, 748 F.2d 1109, 1111-1112 (6th Cir. 1984), revg. on another ground a Memorandum Opinion of this Court.

Nothing in *Buffalo Tool & Die* requires us to accept any opinion that does not withstand careful analysis. If expert testimony is to serve its intended purpose, however, we should not and will not reject it without objective reasons for doing so. *Buffalo Tool & Die* simply indicates that an objective reason for doing so is that another expert's opinion is more persuasive. In addition, *Buffalo Tool & Die* does not require that we find that an expert's report is

more persuasive in its entirety. We can find one such report more persuasive on one ultimate element of valuation and another more persuasive on another ultimate element. In this case, neither party has given us any basis for compromise. Because each party bears the burden of proof on a specific issue, each party has a burden of convincing us that we should accept his opinion of value. For the reasons set forth below, we reject petitioner's experts' opinions. We agree with respondent's experts that QM 215 had no value on the date of donation.

Each party argues that the opinions of the other party's experts should be rejected because of bias. There is a substantial difference, however, between (1) the promoter or seller of the item being valued, such as Erickson, and his paid consultant, Jensen, who relied only on information provided by Erickson, and (2) experts employed specifically in relation to a subsequent dispute and not otherwise having to vindicate opinions previously expressed by them. See *Chiu v. Commissioner*, 84 T.C. at 730. That Bennett did work for respondent under an arrangement with another Federal Government agency, by which he was employed, and that Payne had earned substantial sums over a period of years evaluating Erickson projects for respondent, will be given little weight in the absence of objective indicia that their opinions are unreliable. It would be surprising to find any expert witness who is not paid for his testimony, or who testifies contrary to the position of the party who called him. Our decision here is based on the substance of the testimony and not on superficial attempts to discredit the witnesses.

Erickson's testimony is not credible for numerous reasons. There is no independent corroboration that his consolidation theory is recognized in commercial mining, although, in the nature of things, if Erickson is right, numerous potential witnesses would exist. Moreover, the theory does not make sense. There is no explanation why anyone with a valuable claim would give up a percentage of it to someone with a worthless claim, and no evidence as to how many investors actually entered into agreements such as those executed by petitioner. Both the listing of "client benefits" and the actual agreement between Erickson and petitioner

in 1978 expressly disavowed any interest of Erickson in petitioner's claims. None of the agreements mentioned consolidation by name, and the 1978 agreements did not list or describe it as an option. Certainly petitioner and Erickson have not contended that any investor was under an obligation to "consolidate." Valuation on the consolidation theory assumed that everyone joined in. No explanation of the 1981 agreements, which purported to give the holders of claims an interest in ore produced from a larger area, was provided; they appear to be a response to a grand jury investigation that, according to Erickson, commenced in the spring of 1980.[6] Even those agreements did not use the term consolidation or accomplish what Erickson assumed in his valuation, i.e., a viable program of exploiting petitioner's claim.

To argue that QM 215 has value because it is in the general vicinity of valuable claims is on this record comparable to giving value to a lottery ticket, bingo card, or race track ticket because the numbers are close to the winning number. The only justifiable conclusion from the evidence is that Erickson's values were nothing more than "financial fantasies," existing only in his imagination. See *Saviano v. Commissioner, supra.*

Jensen's testimony was similarly unpersuasive. When asked for his understanding of the term "fair market value," he confused that term with the totally unrelated "prudent man rule" used in mining law. See generally *Baker v. United States*, 613 F.2d 224 (9th Cir. 1980). He suggested that the value he computed would be higher if he considered "a depletion factor of 15 percent." Although petitioner repeats this statement in his brief, it is unexplained. It can only be understood in the context of preoccupation with tax consequences.

There is no evidence that Jensen's method of determining value is generally recognized or that *anyone* would pay the so-called "net value" for a single claim such as 215. Jensen

---

[6]Petitioner offered evidence that Erickson was criminally indicted for assisting in the preparation of false tax returns and was acquitted in a second trial after the jury in the first was unable to reach a verdict. Acquittal in a criminal case, in which the parties and the issues were not the same as in this case and the burden of proof was entirely different from this case, is not persuasive. If respondent had determined an addition to tax for fraud in this case, based upon the facts found, Erickson's acquittal would not preclude our sustaining that addition to tax.

relied totally on information fed to him by Erickson and was led through his testimony by petitioner's counsel. He changed his report several times to correct miscalculations. He concluded that each of 210 "A" claims in the Quartz Mountain project had the same value.[7] Notwithstanding his credentials in theoretical geology, Jensen was not shown to be experienced or competent in commercial mining or in appraising mining claims.

Bennett was limited in experience to determining the validity and value of lode mining claims. It is the value of such a claim, however, that we must determine. A final determination of the validity of QM 215 was never made by the BLM or by a court of competent jurisdiction as to that issue. Such determinations are extremely complex and allow for bona fide differences of opinion. See, e.g., *Andrus v. Charlestone Stone Products Co.*, 436 U.S. 604 (1978); see generally 30 U.S.C. secs. 21-54 (1982). Any potential purchaser of the claim, however, would certainly give weight to the opinion of a person such as Bennett and to the objective facts testified to by him in support of his conclusion that the claim was invalid. In contrast, petitioner has not provided any independent or competent evidence to convince us that the claim was valid.

Payne was specifically experienced in valuing unpatented mining claims, and testified that he had valued in the range of hundreds of thousands of claims. Although he disagreed with Bennett as to whether QM 215 should be treated as valid, Payne declined to give QM 215 even nominal value because of the potential owner's liability in the event of injury to a person on the claim and the monetary and paperwork burdens of carrying the claim. He rejected, for persuasive reasons, Erickson's consolidation theory and disagreed with Jensen's calculations.

It is not inconceivable that a speculator or a totally uninformed person might pay some nominal amount for a mining claim such as QM 215. We doubt that anyone would pay as much as $1,000 for the claim. Thus, even if we were to assume that the claim had a nominal value, respondent would have satisfied his burden of proving that the claim

---

[7]We take judicial notice of our own records showing that the following week, in the case of *Parker v. Commissioner*, 86 T.C. 547 (1986), he testified that each mining claim is different.

was overvalued by at least 150 percent. Petitioner has not established his entitlement to any deduction, however, because there is no credible evidence that the claim had any value. Respondent's experts are by far the most reasonable and most reliable of the experts as to value of QM 215.

We note, in this regard, that petitioner's counsel, when cross-examining Bennett, attempted to make a point of the fact that Bennett was not a member of the American Society of Appraisers. Counsel asserted that members of the American Society of Appraisers do appraise mining claims. Petitioner's failure to call a single independent witness who would give evidence that QM 215 standing alone had any value supports the conclusion that it had no value.

### Additions to Tax Under Section 6653(a)

Petitioner contends that he was not negligent because he relied on Edwards. As discussed above, however, Edwards was not shown to have any meaningful knowledge or experience with respect to the value of Erickson's services or the value of the mining claim. Edwards testified that he did not see the mining areas because they were shut down due to snow. Apparently, neither he nor petitioner asked about the effect of frequent heavy snow on the prospects for successful operations. Moreover, petitioner has not shown that he relied on anyone other than Erickson with respect to the purported tax benefits of the transactions or the correctness of the entries on the returns.

The statement for $25,000 received in evidence was dated September 1, 1978, and indicated that it was to "correct" a statement dated November 1, 1978. Two of the claims staked for petitioner were supposedly located in September 1978. Edwards did not go to Nevada until October 31, 1978. Two possibilities exist: Either the deal was made in September, before Edwards made his report to petitioner, or the statement was backdated to a date prior to the location of the two claims. Petitioner has not attempted to explain this discrepancy. Neither explanation, however, helps him.

With respect to the overvaluation, the total absence of objective support for the value claimed on the return requires that we sustain the addition to tax for negligence.

Petitioner relies on the following testimony in support of his burden of proving that respondent's determination of the addition to tax is incorrect.

I can say in all honesty under oath, I was very conscious of the possibility of an IRS rejecting this donation. It was just too evident at the time I was looking at things in '79. They had jumped very hard on diamonds, for example, over-evaluation, [sic] pictures, over-evaluation, [sic] sculptures, over-evaluation. [sic]

And so I was very conscious of—

Q. What, if any, safety factor did you feel you had against an IRS investigation of the claim?

A. Well, what I had just reiterated here in about 50,000 words. I don't know how it would sell in a court of law, but when I'm looking at it for my money, if silver was $6 an ounce and they made an evaluation and I gifted it at $21 and $22 a ounce, certainly there was no intent to deprive the Government or knock down my legitimate claim for a donation.

It would pay three-and-a-half times the amount that when we started with.

But he claimed a value 10 times the amount he "started with"! As stated by the Court of Appeals for the Ninth Circuit in a different tax-avoidance context, "No reasonable person would have trusted this scheme to work." *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1983).

### *Additional Interest Under Section 6621(d)*

Section 6621(d) provides for an increase in the interest rate where there is a "substantial underpayment" (an underpayment of at least $1,000) in any taxable year "attributable to 1 or more tax motivated transactions." The additional interest accrues after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(d). *Solowiejczyk v. Commissioner*, 85 T.C. 552 (1985). A "tax motivated transaction" includes "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(d)(3)(A)(i). Under section 6659(c), a "valuation overstatement" exists if the value of property claimed on a return is at least 150 percent greater than the amount determined to be the correct valuation of the property.

In this case, the additional interest was asserted by respondent by motion to amend the answer filed at trial after due notice had been given to petitioner. See *Law*

*v. Commissioner*, 84 T.C. 985 (1985). Respondent bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.

We apply section 6621(d), even on our own motion in a case such as this, where petitioner made "blatant misuse of the charitable donation provisions" and "participated in a scheme to generate egregious charitable contribution deductions through the gross overvaluation of the items donated." *Johnson v. Commissioner*, 85 T.C. 469, 483-484 (1985). Respondent has met his burden of proof, and petitioner is therefore liable for additional interest under section 6621(d).

*Decision will be entered for the respondent.*