RICHARD E. FLEMING AND DOROTHEA D. FLEMING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fleming v. Commissioner
Docket No. 39979-86
United States Tax Court
T.C. Memo 1989-323; 1989 Tax Ct. Memo LEXIS 323; 57 T.C.M. (CCH) 858; T.C.M. (RIA) 89323; July 5, 1989
Ronald Wyse, for the petitioners. Andrew D. Weiss, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 16,354.26 and $ 11,954.55 in petitioners' Federal income tax for 1978 and 1979, respectively. The sole issue for decision is whether petitioners are entitled to deductions for a charitable contribution pursuant to section 170. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated. The facts set forth in the stipulations are incorporated in our findings by this reference. Richard E. and Dorothea D. Fleming (petitioners) resided in San Luis Obispo, California, at the time they filed their petition. Pursuant to a sales agreement dated August 21, 1967 (the 1967 sales agreement), Wayne L. Romney, Joan E. Romney, and Jack R. Young and Associates, Sellers, agreed to sell a motel property located in Gila Bend, Arizona, to Calvin N. Ashton, Buyer, for a sales price *325 of $ 600,000. The terms of the 1967 sales agreement required an initial payment of $ 60,000 designated as prepaid principal and interest, monthly payments of principal and interest of $ 4,250, and a balloon payment at the end of a 10-year period in an amount equal to the difference between the purchase price and any mortgage debt then outstanding against the property not in excess of the purchase price. The 1967 sales agreement provided, in pertinent part, that: 2. (a) Buyer is purchasing the property subject to the existing indebtedness thereon and is not assuming any of said indebtedness, and Buyer's liability and obligation hereunder shall be limited to his investment in the property in accordance with the terms and provisions of this agreement and there shall be no personal liability on the part of Buyer, nor may any deficiency be assessed against Buyer, and Sellers will be limited to look solely to the real and personal property involved in this transaction. * * * 10. Notwithstanding any of the terms and conditions hereinabove set forth, it is agreed between the parties that Buyer shall no later than ten (10) years from close of escrow pay in full Sellers' equity in *326 the premises, in which event Buyer shall assume the outstanding mortgages of record against the property. Sellers' equity at the end of the tenth year, or at any given time, shall be the difference between the outstanding encumbrances as of the date of the computation of the equity and the principal balance due under this contract of sale as of the date of said computation. 11. The parties further agree that Sellers may refinance the existing obligations against the property so long as the net proceeds from said refinancing are applied after payment of all loan costs, including discount and loan expenses, on the balances then owing on the obligations now existing, provided further that such refinancing shall not exceed the principal balance still owing under this agreement, and the parties agree to sign the necessary documents to permit said refinancing so long as the refinancing is in accordance with the terms and provisions hereof. In accordance with the terms of the 1967 sales agreement, on February 15, 1971, Romney International Hotels, Inc., Wayne L. Romney, and Joan E. Romney (the Romneys) mortgaged the motel property for $ 600,000 with Western Financial Corporation *327 (Western). Under the terms of the 1967 sales agreement, this mortgage remained the sole obligation of the Romneys until the end of the 10-year period, at which time the investors were to assume it. Pursuant to a warranty deed dated September 9, 1967, Wayne L. Romney, Joan E. Romney, and Jack R. Young and Associates, grantors, conveyed the motel property to Calvin N. Ashton subject to the terms of the 1967 sales agreement. By a "Deed and Assignment" dated September 11, 1967, Calvin N. Ashton then conveyed all of his right, title and interest in the motel property and the 1967 sales agreement to the following investors: Interest
Assignee
0.40
Robert A. & Dorothy R. Pullman
0.10
Edward A. & June W. Kemler
0.10
Edd Ralph Dickman
0.10
Richard I. & Betty Jane Benz
0.10
Joseph C. & Marjorie S. Hayward
0.10
Paul G. & Betty D. Aten
0.10
Petitioners
1.00
The investors, including petitioners, leased the motel property to Cambridge Management Company (Cambridge) for a 10-year term beginning September 11, 1967, and ending September 11, 1977. Jack R. Young (Young) signed the lease on behalf of Cambridge. Under the terms of the lease, Cambridge agreed to make *328 monthly rental payments as follows: $ 750 per month for the first 12 months, $ 2,750 per month for the next succeeding 12 months, and $ 4,250 per month for the 25th through 120th month. Cambridge subleased the motel property to Romney Hotels, Inc., for the same 10-year term and monthly rental payments as were provided in the lease. Wayne L. Romney signed the sublease on behalf of Romney Hotels, Inc. Except for the $ 60,000 prepayment of principal and interest, no cash passed between the sellers and the investors during the 10-year lease term. The transaction was designed so that the lease payments would service the debt on the property and there would be no cash flow, either positive or negative, during the 10-year lease term. Petitioners learned about Jack R. Young and Associates through friends who had invested with that firm. The motel property was the first real property that petitioners purchased for investment purposes. Petitioners did not consult with an attorney or other expert regarding this transaction and relied entirely on Young to determine the value of the property and the form of the transaction. Petitioners did not visit the property before making *329 their investment and did not know any of the other investors. Sometime in 1976 or 1977, near the end of the 10-year lease term, petitioners informed Young that he could dispose of the property. Petitioners left the decision of how to dispose of the property entirely up to Young. In August 1977, Young purportedly received an offer to purchase the motel property for $ 850,000. This offer was rejected. In 1978, Young advised petitioners to donate the property to charity. Petitioners received a pamphlet outlining the charitable activities of the Pacific Institute for Advanced Studies (the Institute). The Institute was an exempt organization listed in Internal Revenue Service Publication No. 78, the "Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954," during 1978. In March 1978, petitioners and the other investors executed a document entitled Assignment of Sales Agreement under which their interest in the 1967 sales agreement was to be assigned to the Institute. An "Acceptance" of the assignment was executed May 16, 1978, by J. A . Maillian (Maillian), who represented that he signed as "agent" for the Institute. *330 The Assignment of Sales Agreement provided, in pertinent part, that: By accepting this Assignment, Pacific Institute for Advanced Studies accepts the property "as is" and agrees to assume and perform all obligations to be performed by the below named Assignee under such contract as assigned, and to indemnify the below named Assignee harmless from any liability for performance or non-performance of such obligations. In March 1978, petitioners and the other investors also executed a document entitled Assignment of Lease under which their interest in the 1967 lease with Cambridge Management Company was to be assigned to the Institute. An "Acceptance" of that assignment was also executed by Maillian as "agent" for the Institute. Petitioners had not heard of the Institute prior to executing the assignments. Petitioners' only communication with the Institute was a letter dated July 21, 1978, and purportedly signed by Mason Rose (Rose), Chancellor, acknowledging the gift of their equity in the motel property. The letterhead listed an address for the Institute of 9465 Wilshire Boulevard, Suite 515, Beverly Hills, California 90212. Rose did not sign the letter from the Institute *331 to petitioners acknowledging their gift. The address on the letterhead was not the address of the Institute but was the address of Maillian. During 1978, Maillian had been appointed business manager of the Institute. As business manager, Maillian had no authority to accept donations on behalf of the Institute. Despite his lack of authority to do so, Maillian purportedly accepted donations on behalf of the Institute. The Institute, however, did not receive any property as a result of donations purportedly accepted by Maillian. In early January 1978, Allen Hom (Hom) responded to a newspaper advertisement describing a motel property for sale. Hom met with Maillian to discuss the property and made an offer to purchase the motel in mid to late January 1978. The February 15, 1971, mortgage on the motel property with an original balance of $ 600,000 was released by Western on March 22, 1978. Hom received a warranty deed to the motel property dated May 16, 1978, and signed by Maillian as "Authorized Agent" for the Institute. Throughout this transaction Hom dealt only with Maillian, who purported to represent the Institute. At the time of the purported gift of the motel property *332 to the Institute and the subsequent sale to Hom, the Institute's financial books and records were prepared by Maillian. In early 1982, after learning that the Internal Revenue Service was planning an audit of its activities, the Institute hired a certified public accountant, Philip Tesler (Tesler). When Tesler received the Institute's financial records from Maillian, the general ledger reflected a note receivable from Hom in the amount of $ 292,397. Because he could not find that the Institute ever received any payment pursuant to the note receivable, Tesler reversed the entry from the Institute's books to reflect a zero balance. Petitioners reported adjusted gross income of $ 112,345.13 and $ 120,613.23 on their Federal income tax returns for 1978 and 1979, respectively. Petitioners claimed deductions for cash contributions of $ 2,204.08 and $ 3,163.30 and noncash contributions of $ 31,499.42 and $ 22,138.00, respectively, on their 1978 and 1979 Federal income tax returns. The noncash amounts were represented to result from the gift of their 10-percent interest in the motel property to the Institute, limited in 1978 by the 30 percent of adjusted gross income limitation in *333 section 170(b)(1)(C) and (E) and carried over to 1979. In calculating the amount of these deductions, petitioners placed a fair market value on the motel property of $ 1,000,000 less the outstanding mortgage balance that petitioners believed to be $ 463,000. When preparing their 1978 and 1979 tax returns, petitioners relied on an unsigned appraisal report on the printed stationery of Allied Property Analysts, dated March 14, 1978, for Jack R. Young, Trustee, that valued the motel property at $ 1,000,000. Respondent disallowed these deductions in full because petitioners had not established (1) the fair market value of their donations, (2) that the donations were contributed to a qualified organization, or (3) that the donations met the requirements of section 170. OPINION The sole issue for decision is whether petitioners are entitled to deductions for a noncash charitable contribution pursuant to section 170. Petitioners bear the burden of proving that they are entitled to the deductions that they claim. Rockwell v. Commissioner, 512 F.2d 882, 886 (9th Cir. 1975); Rule 142(a). Petitioners argue that they had a sufficient interest in the motel property *334 to support a charitable contribution based on the fair market value of the property. Petitioners also assert that they had the requisite donative intent to make a gift of the property to the Institute and that they did not receive a quid pro quo for their contribution. Finally, petitioners contend that, notwithstanding Maillian's lack of authority to accept contributions on behalf of the Institute, they and the other investors validly conveyed a gift of their interest in the motel property to the Institute. Respondent argues that the purported transfer to the Institute was a sham, that the purported transfer was made for petitioners' benefit rather than out of their detached and disinterested generosity, and that the Institute never accepted the property nor received any benefit from the purported contribution. Petitioners argue that they had a sufficient interest in the motel property to support a charitable contribution. Respondent argued at trial and in his trial memorandum that the instant case is the fifth in a series of cases involving tax shelters set up by Young: Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976); *335 Hilton v. Commissioner, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982); Narver v. Commissioner, 75 T.C. 53 (1980), affd. 670 F.2d 855 (9th Cir. 1982); and Pacific Gamble Robinson and Affiliated Cos. v. Commissioner,T.C. Memo. 1987-533. Respondent contended that petitioners were trying to extricate themselves from a "burned-out" tax shelter, where the tax advantages of the investment were no longer present. On brief, petitioners argue that the facts in the instant case are distinguishable from the prior Young tax shelters and that the legal principles set forth in Estate of Franklin compel a conclusion that petitioners had an interest in the donated property. Because respondent did not respond to petitioners' arguments in his (seriatim) answering brief, petitioners argue that respondent has effectively conceded that petitioners did have an interest in the motel property sufficient to support a charitable contribution. Assuming that petitioners' 10-percent interest in the 1967 sales agreement is sufficient to support a charitable contribution, petitioners have nonetheless failed to provide *336 any admissible or persuasive evidence to support the deductions claimed. Estate of Franklin involved the deductibility of interest and depreciation payments claimed with respect to an Arizona motel purchased by a limited partnership. Under the terms of the sales agreement, which were similar to the terms in the instant case, the sellers, the Romneys, agreed to sell a motel property to a partnership organized by Young for $ 1,224,000. Although the Court of Appeals for the Ninth Circuit disallowed the deductions, the court stated that "the characteristics set out above can exist in a situation in which the sale imposes upon the purchaser a genuine indebtedness * * * which will support both interest and depreciation deductions." Estate of Franklin v. Commissioner, 544 F.2d at 1047. The taxpayers in Estate of Franklin failed to prove that the purchase price was at least approximately equivalent to the fair market value of the motel property. Thus, that court held that the taxpayers had not made an investment which would yield an equity in the property and that the transaction lacked the economic substance necessary to justify treating it as a sale. Likewise, *337 petitioners have not provided any evidence of an arm's-length purchase or that the purchase price they paid was approximately equivalent to the fair market value of the motel property. Petitioners argue that the $ 1,000,000 appraisal valuation of the motel property upon which their tax returns were prepared reflects the actual fair market value of the property interests contributed. Additionally, petitioners contend that factual evidence submitted at trial, the purported offer to purchase the property in August 1977 for $ 850,000 and Hom's testimony that he purchased the property from the Institute, support a conclusion that the fair market value was not less than $ 668,000 (an amount that erroneously includes $ 18,000 apparently paid by Hom for other assets). Petitioners offered an unsigned appraisal report on the printed stationery of Allied Property Analysts, dated March 14, 1978, for Jack R. Young, Trustee, that valued the motel property at $ 1,000,000. The report was admitted into evidence for the limited purpose of showing that petitioners relied on the valuation when preparing their 1978 and 1979 tax returns. The appraiser did not testify at trial, and the opinions expressed *338 in the unsigned appraisal report were therefore not subject to cross-examination. The appraisal was inadmissible hearsay under Rules 801(c) and 802, Federal Rules of Evidence. Thus, the appraisal was not admitted as evidence of the value of the motel property and its use as such was specifically rejected by this Court. Nonetheless, petitioners contend that the appraisal meets the requirements of Rev. Proc. 66-49, 1966-2 C.B. 1257, for appraisals that are used to support charitable contributions. Petitioners have, however, disregarded the requirements that the appraisal report contain the appraiser's qualifications and signature. Similarly, the revenue procedure makes it clear that the weight to be accorded an appraisal depends on the competence and knowledge of the appraiser as well as the probative facts supporting the opinion. Petitioners have failed to present admissible evidence that the appraisal valuation did approximate the fair market value of the motel property at the time the 1967 sales agreement was assigned. In any event the revenue procedure does not establish rules of evidence for proceedings in this Court. Sec. *339 7453; Rule 143(a). Petitioners argue that the August 1977 offer to purchase the property for $ 850,000 represents factual evidence supporting the appraisal valuation. Respondent argues, and we agree, that the letters purporting to be an offer to purchase the property are not reliable evidence of the value of the property. Petitioners presented no evidence that the offer was an arm's-length transaction between unrelated parties or otherwise bona fide. The offer, therefore, does not represent credible evidence of the value of the property. Hom testified that he paid between $ 650,000 and $ 675,000 for the motel property. Approximately $ 290,000 of the purchase price was purportedly paid in cash and the remainder by note. Hom, however, was unable to recall the details of the transaction, and the terms are not otherwise in evidence. Petitioners did not produce any documents to corroborate the sale transaction. Hom's uncorroborated testimony carries insufficient weight to meet petitioners' burden of proof of the fair market value of the motel property at the time of the assignment. Accordingly, petitioners have failed to present admissible or persuasive evidence on which the *340 Court can determine the fair market value of the property or of petitioners' interest in it. Most importantly, petitioners' conduct as owners belies a belief of any significant fair market value of their "gift." Petitioners were disinterested investors who proceeded as if they had no concern about whether the purchase price or rental rate accurately reflected the value of the property or its use. Petitioners were similarly disinterested in the disposition of the property. The only indication of a relationship between petitioners and the Institute is through the "gift" transaction arranged by Young and Maillian. Petitioners claim that they gave to the Institute their interest in an asset having an unencumbered value in excess of 50 percent of their adjusted gross income for either of the years in issue. Based on the entire record, we do not accept petitioners' claims that they gave to a charity unknown to them an asset that was worth any significant value. See Snyder v. Commissioner, 86 T.C. 567, 581 (1986). (Compare Suna v. Commissioner, T.C. Memo. 1988-541.) Not a single piece of objective evidence or expert opinion supports their position, *341 and their own conduct undermines their position. Petitioners failed to carry their burden of proof on the value, if any, of their "gift." We, therefore, need not decide whether, as petitioners contend, Maillian had the apparent or actual authority to accept the contribution or whether, as respondent contends, the Statute of Frauds applies to this transaction. Although respondent disallowed petitioners' noncash charitable deductions in full, he has "charitably" refrained from asserting additions to tax or additional interest for which petitioners might be liable. Under the circumstances of this case, we decline to do so on our own motion. Compare, however, Johnson v. Commissioner, 85 T.C. 469, 483-484 (1985), where we applied sua sponte section 6621(c) (formerly 6621(d)) based upon our finding of a valuation overstatement with respect to a contribution to charity. To reflect the foregoing, Decision will be entered for the respondent.