PACIFIC GAMBLE ROBINSON AND AFFILIATED COMPANIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pacific Gamble Robinson v. Commissioner
Docket No. 4055-85.
United States Tax Court
T.C. Memo 1987-533; 1987 Tax Ct. Memo LEXIS 525; 54 T.C.M. (CCH) 915; T.C.M. (RIA) 87533; October 20, 1987. James M. Shaker, Gordon W. Jacobson, and Chris J. Rigos, for the petitioner. Henry Thomas Schaefer, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: 1977
$ 126,665.37
1978
$  59,442.00
1979
$148,138.00
The issue for decision is whether petitioner is entitled to deductions for depreciation under section 167 [1] with respect to an apple packing plant, which it purportedly sold and contemporaneously leased back from the purchaser, and interest deductions under section 163 with respect to indebtedness secured by mortgages on the plant. FINDINGS OF FACT Petitioner Pacific Gamble Robinson (hereinafter PGR or petitioner), a corporation *527 organized under the laws of Delaware, had its principal place of business in Kirkwood, Washington, at the time the petition was filed. The petition was filed on behalf of PGR as well as a group of subsidiaries of which it is parent. Throughout the period here in issue, PGR was engaged in the business of packaging food products and selling them to institutional and food service customers. Yakima Apple Facility Sale and Leaseback
PGR's Yakima Apple Facility (Yakima facility) is a single-purpose, highly specialized facility designed and built specifically for the storage and packing of fruit. The facility consists of controlled atmosphere storage facilities and cold storage warehouses with a basic size of 14,000 square feet of floor area and approximately 30 feet of clear span. In 1968 PGR conveyed its Yakima facility to Third Birkenhead Properties Inc. (Third Birkenhead) for a stated price of $ 500,000 of which $ 490,000 was financed through the issuance of a nonrecourse note dated May 2, 1968, payable to Minnesota Mutual Life Insurance Company (Minnesota Mutual). At the same time, the property was leased back to PGR. Third Birkenhead was a financing corporation owned *528 by 59th Property Associates, a limited partnership syndicated by Roderick H. Cushman (Cushman) and Jack R. Young (Young), and created in 1968 for the sole purpose of serving as a conduit and nominee for the sale and leaseback of the Yakima facility. The lease between Third Birkenhead, as lessor, and PGR, as lessee, had a primary term of 25 years with six 5-year extended terms at the option of the lessee. For the primary term, the lease called for rental payments ($ 10,450 quarterly) nearly equal to the mortgage payments ($ 10,431.04 quarterly) by Third Birkenhead to Minnesota Mutual, not taking into account a balloon payment due at the end of the primary term. The annual rental rate was $ 17,500 for the first extended term and $ 10,000 per annum for each succeeding extended term. The Third Birkenhead lease is a triple net lease. PGR has the responsibility to pay all taxes and levies (sec. 8), to carry casualty, public liability, workmen's compensation, and other insurable hazards insurance (sec. 15), and to maintain and repair the premises (sec. 12). In the case of a major condemnation or casualty or economic abandonment (sec. 14, 15, 16), the lessor is protected against possible *529 risk of loss by a mandatory buy-back provision. Under those provisions, PGR was required to make an irrevocable offer to buy back the property at a price approximately equal to the balance remaining unpaid on the mortgage. The lease authorized the lessee (PGR) at its sole expense to erect upon the premises any other additional buildings, structures, and improvements, and to alter and replace existing structures. PGR could then request the lessor (Third Birkenhead) to reimburse it for the expenditures so incurred, and the lessor agreed to make the reimbursement on stated conditions: (1) the lessor would be able to sell additional notes for the purpose of acquiring funds for the reimbursement; and (2) PGR and the lessor would execute a supplemental lease satisfactory to the mortgages which would (A) increase the basic rent payment during the primary term in an amount at least sufficient to make each payment, when due, of principal and interest on the additional notes; (B) increase the basic rent payment required to be made during the extended term of the lease by an amount equal to .875 percent of the expenditure; and (C) increase the scheduled prices at which PGR was required to *530 make an irrevocable offer to purchase the property by amounts sufficient to repay the then outstanding principal amount of the additional notes. The lease further provides that "Lessor shall incur no liability under this Lease by reason of its inability to finance the cost of the Reimbursable Expenses." If the lessee agrees to the increased rents and the lessor does not reimburse the lessee for the expenditures, the lessee may terminate the lease and make an irrevocable offer to purchase the property at a price substantially equal to the principal balance of the outstanding existing notes. All machinery and equipment placed on the property by PGR remained its property and could be removed by PGR at the termination of the lease. The lessor had the right to require PGR to purchase the property at the end of the primary term in accordance with a price schedule attached to the lease. The stated purchase price at the end of the primary term nearly equalled the then outstanding balance owed on the promissory note issued by Third Birkenhead to Minnesota Mutual. Under date of April 15, 1968, Third Birkenhead assigned its interest in the PGR lease to Minnesota Mutual as collateral security. *531 The assignment covered in part: [A]ll of the Assignor's [Third Birkenhead's] estate, right, title and interest as lessor under a Lease, dated as of April 15, 1968 between the Assignor as lessor and the Lessee as lessee (the Lease), together with all rights, powers, privileges, options and other benefits of the Assignor as lessor under the Lease, including, but not by way of limitation, (i) the immediate and continuing right to receive and collect all rents, income, revenues, issues, profits, insurance proceeds, condemnation awards, moneys and security payable or receivable under the Lease or pursuant to any of the provisions thereof * * * (ii) the right to accept or reject any offer by the Lessee to purchase the Property (provided that such acceptance or rejection shall be permitted by the terms of the Deed of Trust), (iii) if the Lessee exercises any right to purchase the Property, the right to execute and deliver, as agent and attorney-in-fact of the Assignor, an appropriate deed and other instruments necessary for such conveyance, * * *.
PGR was required to deliver to Minnesota Mutual, within 90 days of the end of each fiscal year of the lessee, ten copies of the balance *532 sheet of the lessee and its consolidated subsidiaries and statements of income and surplus as at the end of such year. In summary, the total investment in the land, buildings, and improvements was $ 500,000. The 25-year secured note to Minnesota Mutual was in the amount of $ 490,000, payable in quarterly installments totaling $ 41,724.16 per year and a balloon payment of 15 percent of the principal or $ 73,500, which together with interest was due June 1, 1993. The lease payments,to be made quarterly, came to a total of $ 41,800 per year. The cash flow to Third Birkenhead was to be $ 75.84 per year. Second Birkenhead and Fifth Cheltenham Transactions
In 1967, PGR sold four Tradewell grocery stores to Second Birkenhead Properties, Inc., (Second Birkenhead) for $ 850,000 and leased them back. In the same year, another corporation, Albertson's Inc., sold five grocery stores to Fifth Cheltenham Properties, Inc., (Fifth Cheltenham) for $ 1,732,830 and leased them back. Fifth Cheltenham, like Second Birkenhead, was a single purpose financing corporation; it was created in 1967 for the sole purpose of serving as a conduit and nominee for the sale and leaseback of the five Albertson's *533 stores. Second Birkenhead and Fifth Cheltenham, owned by 59th Property Associates in which Young and Cushman were general partners, borrowed funds from insurance companies to finance the purchase of the nine stores. PGR and Second Birkenhead, and Albertson's and Fifth Cheltenham assigned their leases to the trustees for their respective lenders. The rental payments by PGR and Albertson's, which slightly exceeded the loan amortization payments, were made directly to the respective lenders or their representatives. The primary terms of the two sets of leases ran for 25 years with six 5-year extended terms at the option of the lessee. Second Birkenhead and Fifth Cheltenham had the right to require PGR and Albertson's, respectively, to purchase the property at certain times, including the end of the primary term, in accordance with a buy-out schedule attached to each lease. The purchase prices provided in the schedules nearly equalled the outstanding balance that would be owed on each stated date on the promissory notes given by Second Birkenhead and Fifth Cheltenham. Transfers to 59th Property Associates
In December 1968, Jack R. Young and Associates and Roderick H. Cushman *534 and Associates created a limited partnership named 59th Property Associates. Cushman caused Second Birkenhead, Third Birkenhead, and Fifth Cheltenham to transfer their ten properties, described above, to 59th Property Associates. Both Young and Cushman had been engaged in the marketing of real estate tax shelters for several years. Cushman had syndicated the 1967 Fifth Cheltenham sale and leaseback and the 1968 Third Birkenhead sale and leaseback. In organizing 59th Property Associates, Young and Cushman became general partners with each owning one-half of a 1-percent interest. The other 99 percent was sold on December 17, 1969 (but effective January 2, 1969) to Ralph Englestad (Engelstad) as a limited partner. William Bowman (Bowman) of Kenneth Bowman & Associates handled the sale to Englestad. Englestad was owner of the Imperial Palace Hotel and Casino in Las Vegas, a hotel in Colorado Springs, Colorado, a lime mine in Mississippi, office buildings and other land holdings scattered across the country from Florida to Hawaii as well as other interests. At the time he acquired his interest in 59th Property Associates, he was interested in obtaining an immediate tax shelter.
*535 Bowman met with Englestad and his accountant twice for approximately one-half to one hour in November or December 1969 for the purpose of offering him the limited partnership interest in 59th Property Associates as a tax shelter. The only documentation presented to Englestad prior to his entering into the 59th Property Associates transaction was information relating to the tax losses it would produce. That document included projection sheets prepared by Young showing lease income and mortgage payments which indicated the tax losses to be derived up to 1977 on the Second Birkenhead and Third Birkenhead properties and up to 1975 on the Fifth Cheltenham properties. Englestad expended $ 128,200 (of which $ 3,200 was returned as a discount) in obtaining his 99 percent limited partnership interest in 59th Property Associates. [2] Of this amount, Cushman received $ 80,000 and Young received $ 48,200 for their services in providing Englestad with a tax shelter. The letter agreement stating the terms of which Englestad made his investment specified, as a condition, that the transaction had to be closed by December 30, 1969. Englestad deducted the entire $ 128,200 commission to the promoters, *536 Cushman and Young, on his income tax return for that year. At the time he made the investment, Englestad had not seen any of the properties and was not told the addresses of the properties; up to the date of the trial he had not seen the properties, even though he had inspected every other piece of real estate he owned; he did not request or obtain any appraisals of the properties held by the partnership; he did not request or obtain any title reports or copies of financing documents covering the transaction; he submitted only his check for $ 128,200 following his meetings with Bowman. At the time of Englestad's investment in 59th Property Associates, he was guaranteed *537 a stated amount of dollar depreciation on the properties. He was further assured that "if this transaction for some reason would not hold up" the properties would be repurchased from him. Englestad expected to receive a tax write-off from the transaction at the rate of $ 3.50 for each $ 1 paid. He actually received only a $ 3 to $ 1 write-off. When Englestad learned that his tax write-offs would not meet his expectations, he communicated several times with Bowman and Young complaining about the amount of depreciation that he had purchased and requesting recalculations of write-offs based on various depreciation methods. Englestad held several meetings with Young's representative regarding loss deductions Englestad expected to obtain from the partnership. Young Bankruptcy and Englestad's Release
In 1974, Young Properties Corporation (formerly Jack R. Young and Associates, Inc.) and its affiliates entered into proceedings for arrangement with their creditors under chapter 11 of the Bankruptcy Act. By letter dated January 7, 1974, Bowman informed Englestad of Young's bankruptcy. Englestad responded to Bowman's letter, indicating that he still had not received the depreciation *538 he thought he had purchased and demanded additional properties to make up the deficiency. On September 9, 1974, the parties settled their dispute, and Englestad executed releases to Cushman and Young in exchange for their 1/2 of 1 percent interests in 59th Property Associates. The releases included the statement that "Englestad feels that he has not received all the tax deductions it was originally represented that he would receive." Sometime after September 1974, Englestad conveyed his interest in 59th Property Associates to himself and his wife. In 1983, the Englestads sold nine of the properties they had acquired in 1974 from 59th Property Associates, leaving only the Yakima facility. 1975 and 1976 Expansion of the Yakima Facility
Prior to and during 1975 and 1976, PGR spent almost $ 2.6 million in improvements and additions to the Yakima facility. PGR provided all of the interim financing. Improvements to the Yakima facility included cold storage rooms and a packing house designed to increase fruit storage area and facilitate the apple packing operation previously preformed in PGR's packing plant in downtown Yakima. In 1975, in accordance with the lease provisions *539 summarized above, PGR contacted Cushman for the purpose of obtaining permanent financing for the construction costs incurred with respect to the facility. Englestad and PGR executed a letter of understanding dated June 9, 1976, setting forth a plan proposed by Cushman for obtaining the needed financing. In obtaining the financing under Cushman's plan, a new corporation, Sixth Birkenhead Properties, Inc. (Sixth Birkenhead) was incorporated, and the Englestads owned all of its stock. Cushman arranged a loan from Luthern Mutual Life Insurance Company (Lutheran Mutual) and Minnesota Mutual in the amount of $ 2.6 million, the costs of the additions and improvements of the Yakima facility as well as all closing costs and the balance then remaining on the May 2, 1968, note to Minnesota Mutual. The Englestads quitclaimed all their interest in the Yakima facility to Sixth Birkenhead. Sixth Birkenhead obtained a loan of $ 1,040,748 from Lutheran Mutual and obtained one loan from Minnesota Mutual for $ 1,561,123 and another for $ 406,515.60. The latter amount replaced the outstanding amount due on the 1968 Third Birkenhead note. The aggregate amount of the nonrecourse notes evidencing *540 the loans came to $ 3,008,386.60 [3]
To secure the payment of nonrecourse notes to the insurance company lenders, Sixth Birkenhead executed a Morgage and Deed of Trust, as of June 1, 1977, to Shawmut Bank of Boston, N.A., and G. Keith Grim as trustee (trustee). Englestad, as president of Sixth Birkenhead, authorized the $ 2,601,871 obtained from the loans to be transferred to PGR. As of June 1, 1977, PGR and Sixth Birkenhead executed an amended lease and a memorandum of lease. In the main, the substantive provisions of the 1968 lease between PGR and Third Birkenhead remained in effect but some changes were made. The primary term of the amended lease was extended through August 31, 1977. The amended lease also provided for six 5-year extended terms (1997-2027). The amended lease further provided that if prior to June 1, 1997, PGR had not purchased the Yakima facility, then PGR was deemed on that date to have made an irrevocable offer to purchase the *541 facility on August 31, 1997, at a price equal to the greater of the fair market value of the property on August 31, 1997, and the price determined in accordance with a schedule contained in the amended lease (Schedule C). The purchase price on August 31, 1997, set forth in Schedule C ($ 404,295.79) nearly equalled the 15 percent balloon payments ($ 404,199.62 in the aggregate) [4] due on the promissory notes executed by Sixth Birkenhead to the insurance company lenders. In determining the fair market value of the facility at the end of the primary term, the amended lease encumbering the property was to be taken into account by presuming PGR had exercised its option to extend the lease for all six 5-year extended terms. In the event that PGR and Sixth Birkenhead could not agree on a fair market value within these parameters, the amended lease provides for professional appraisers to evaluate the property. Englestad could reject PGR's offer only with the consent of *542 the insurance company lenders. At the end of the lease, the improvements will be fully depreciated through wear and tear or functional obsolescence. The rental payments under the amended lease slightly exceeded the mortgage payments required to amortize the $ 3,008,386.60 borrowed to finance the Sixth Birkenhead transaction, less the balloon payments due at the end of the primary term of the lease. The excess rental payments over mortgage payments, totaling $ 2,443.42 over the 20-year primary term of the lease would be absorbed by miscellaneous expenses incurred by Englestad in connection with the Sixth Birkenhead transaction. The rental payments under the lease to be made directly to the insurance company lenders by PGR were as follows: (a) For the first 16 years of the primary term of the lease (1977-1993), $ 80,050 per quarter. [5]
*543 (b) For the last 4 years of the primary term of the lease (1993-1997), $ 74,250 per quarter. (c) For the first extended term of the lease (1997-2002), $ 27,150 per quarter. (d) For the remaining extended terms (2002-2027), five 5-year periods, $ 15,525 per quarter. By an instrument entitled "Assignment of Lease and Agreement" made as of June 1, 1977, Sixth Birkenhead assigned as collateral for the loan all of its interest in the lease to the trustee for the insurance company lenders and all rents and other income received under the lease until the principal amount of the indebtedness of Sixth Birkenhead to the insurance companies was fully paid. PGR was a party to the assignment and agreed to pay and deliver to the trustee for the insurance company lenders all of the rents and other monies payable by PGR under the lease. The assignment provided: 1. The Assignor, in furtherance to the covenants of the Indenture and as security for the payment of the principal of and premium, if any, and interest and all payable under the Indenture and the performance and observance of the provisions thereof, has assigned, transferred, conveyed and set over, and by these presents does assign, *544 transfer, convey and set over to the Trustees Assignor's estate, right, title and interest as lessor under the Lease, together with all rights, powers, privileges, options and other benefits of the Assignor as lessor under the Lease, including, without limitation, (i) the immediate and continuing right to receive and collect all rents, income, revenues, issues, profits, insurance proceeds, condemnation awards, moneys and security payable or receivable under the Lease or pursuant to any of the provisions thereof, whether as rents or as the purchase price of the Property or otherwise (except sums payable directly to any person other than the lessor thereunder); (ii) the right to accept or reject any offer by the Lessee to purchase the Property (provided that such acceptance or rejection shall be permitted by the terms of the Indenture); (iii) if the Lessee shall exercise any right to purchase the Property, the right to execute and deliver, as agent and attorney-in-fact of the Assignor, an appropriate deed and other instruments necessary for such conveyance; (iv) the right to perform all other necessary or appropriate acts as said agent and attorney-in-fact with respect to such purchase *545 and conveyance; (v) the right to make all waivers and agreements; (vi) the right to give all notices, consents and releases; (vii) the right to take such action upon the happening of a default under the Lease, including the commencement, conduct and consummation of proceedings at law or in equity as shall be permitted under any provision of the Lease or by law or in equity; and (viii) the right to do all other things whatsoever which the Assignor or any lessor is or may become entitled to do under the Lease. Notwithstanding any other provision of this Assignment, any insurance proceeds or condemnation awards received by the Trustees shall be made available to the Lessee as and to the extend required by the terms of the Lease. The Englestads, in their individual capacities, did not execute the notes to the insurance company lenders but by an assumption agreement dated June 21, 1977, agreed to be bound by the lease and assignment thereof and assumed the obligations of Sixth Birkenhead contained in the indenture to the trustees for the insurance companies. However, the notes signed by Sixth Birkenhead provided that the owners thereof would "look solely to the Trust Estate and to the *546 sums due and to become due under the lease" for their payment. The term "Trust Estate" was defined to mean "all moneys and other property subject or intended to be subject to the lien of this Indenture at any time." Section 11.1 of the indenture provides: Immunity from Liability. No recourse shall be had under any rule of law, statute or constitution, by the enforcement of any assessment or penalty or otherwise for the payment of the principal of or interest or premium, if any, on the Notes or for any claim based thereon or otherwise in respect thereof or based on or in respect of this Indenture or the Note Agreements against (i) any incorporator, any past, present or future subscriber to the capital stock of the Company [Sixth Birkenhead], any stockholder, officer or director thereof or any predecessor or successor corporation; or (ii) any corporation, partnership (or any partner thereof) or individual to which the Trust Estate [Yakima facility] or any part thereof shall have been transferred; or (iii) any person other than the Company on the ground that in entering into the transactions evidence [sic] hereby and by the Notes the Company was acting as an agent for the *547 account and benefit of such person and that such person was a principal of the Company. It is expressly understood that by the acceptance of the Notes all such liability is expressly waived and released as a condition of and as consideration for the execution of the Notes and the Indenture and the Note Agreements and that the registered owners agree to look solely to the Trust Estate and to the sums due and to become due under the Lease for the payment of any such sum. * * * PGR also executed a document entitled Indemnity Agreement, dated as of June 29, 1977, in which PGR covenanted to the insurance company lenders, "as a principal and not as a surety or guarantor," that it would pay the amount owed pursuant to the three promissory notes executed by Sixth Birkenhead. The Indemnity Agreement identifies the notes totaling $ 3,008,386.60 and states: [P]ursuant to the terms of the Note Purchase Agreements, dated June 1, 1977 (the Agreements), between the Company [Sixth Birkenhead], and the Note Purchasers [the insurance company lenders], and in consideration therefor, the undersigned [PGR] hereby covenants and agrees with the Note Purchasers, as a principal and not as a *548 surety or guarantor, that the undersigned will pay, as and when the same shall become due and payable, and save the Note Purchasers harmless from any and all liabilities or failure to pay the sums for which the Company is liable pursuant to Section 11 of the Agreements. Englestad was not consulted with respect to the expansion of the Yakima facility and did not become aware of PGR's expansion until after it had begun. At some point during the construction of the improvements, Englestad was asked to deed a portion of the property to Yakima for an easement. PGR dealt solely with Cushman in negotiating the interest rates on the loan and rental payments under the amended lease. Although he was sole owner of Sixth Birkenhead, Englestad did not participate in its incorporation and was unaware of who was responsible for its organization. Englestad paid $ 9,594 to Cushman, which represented one-half of his fee for arranging the Sixth Birkenhead transaction; PGR paid the other half. After the financing was in place, Sixth Birkenhead quitclaimed its interest in the Yakima facility to the Englestads. Expert Reports
Petitioner and respondent each submitted expert reports and offered *549 expert testimony to provide an analysis of the economics of the sale-leaseback transaction. Petitioner's expert, C. Everett Steichen (Steichen) has been employed as a real estate consultant for 31 years. Since 1981 Steichen has been associated with the private consulting firm of Wallace and Steichen, engaged in providing market analyses, economic evaluations, and financial and developmental consultations to various clients, including retail organizations, shopping center developers, major corporations, investors, and financial institutions. [6]
Steichen was retained by PGR to analyze the 1977 Sixth Birkenhead transaction and determine whether or not the transaction had any economic or business significance from the lessor's position. Steichen concluded that Englestad, the lessor, was never at risk with respect to the transaction and had no opportunity for financial gain which would justify making the investment. Respondent's expert, William G. Kimmel (Kimmel) was retained by Englestad and *550 subpoenaed by respondent to testify at trial. Kimmel has been employed as an independent real estate appraiser since 1968 and is a member of the American Institute of Real Estate Appraisers with a designation as senior real estate analyst. Kimmel's appraisal was designed to determine "whether or not there was an economic gain to the lessor position as the result of the June 1977 amendment to the original 1968 agreement." Kimmel concluded that modifications in the lease agreement made as part of the Sixth Birkenhead transaction produced limited economic benefits, described in our opinion, to the lessor's position. OPINION Both Englestad and PGR have claimed deductions for depreciation of the Yakima facility and interest on the indebtedness to the insurance company lenders, Lutheran Mutual and Minnesota Mutual. Although recognizing that he is, in a sense, only a stakeholder, respondent here contends that Englestad, who was a principal witness in the case, is entitled to the depreciation and interest deductions on the facility. [7] PGR maintains that it is the owner of the Yakima facility for tax purposes and, consequently, it is entitled to deductions for the depreciation and *551 interest paid to the trustee for the insurance company lenders. [8] PGR argues that its transaction, cast in the form of a sale and leaseback, was, in substance, an arrangement for the permanent financing of its improvements of the Yakima facility. [9]
*552 We hold for petitioner. Section 167(a) authorizes a deduction with respect to property "used in a trade or business" and, as we shall discuss, the deduction is based on an actual equity investment in the property. Section 163(a) allows a deduction for interest on indebtedness. The allowability of these deductions in sale and leaseback cases has received a great deal of attention by the courts in recent years, and the outcome of each case turns on its facts. In Frank Lyon Co. v. United States,435 U.S. 561 (1978), the landmark sale and leaseback case, Worthen Bank, which was prohibited by State and Federal regulations from financing the construction of a new bank building through conventional methods, sold the building to Frank Lyon Co. for a total of $ 7,640,000 and leased it back. Frank Lyon Co. put $ 500,000 down and financed the balance with a third-party lender. The loan was secured by a mortgage on the building, Frank Lyon Co.'s promise to assume personal responsibility for the loan's repayment, and an assignment to the lender of the rental payments under the lease which equaled the installments payable on the mortgage loan. Worthen retained options to *553 repurchase the building at the end of the 11th, 15th, 20th, and 25th year for amounts equal to the then outstanding mortgage plus Frank Lyon Co.'s initial $ 500,000 downpayment with 6-percent compunded interest. Alternatively, Worthen could opt to renew the lease for eight additional 5-year terms. The lease was a net lease with Worthen remaining obligated to pay taxes, insurance, and utilities. The Supreme Court found that, consistent with the form of the transaction, Frank Lyon Co. was the owner of the property for tax purposes. In reaching this conclusion, the Supreme Court emphasized that Frank Lyon Co., and it alone, was liable as principal for the repayment of the $ 7,640,000 loan and made the $ 500,000 investment in the transaction. The Court adopted a test that for a nonuser-owner to be entitled to the tax benefits of a sale and leaseback arrangement, the record must show that his "entry into the transaction was motivated by a business purpose sufficient to justify the form of the transaction, and that the underlying transaction was supported by economic substance." Mukerji v. Commissioner,87 T.C. 926, 959 (1986). [10]
*554 The issue as to the tax effect to be given to the sale and leaseback arrangement thus is basically one of substance versus form. As we view the facts of the case before us in the light of the Frank Lyon Co. principles, the form of the transaction is not consistent with its economic substance. [11] PGR, the lessee, not Englestad, the lessor, was liable as principal for the repayment of the loan for the cost of the Yakima facility and had the burdens and benefits of ownership. The lease with its renewals extending to 2027 gave PGR use of the Yakima facility for a period longer than the facility's anticipated economic life. Englestad's purpose in entering the deal was to obtain tax benefits. He had no realistic prospect of realizing any economic gain apart from tax benefits. PGR is, therefore, entitled to the disputed deductions. *555 1. PGR's Liability as Principal
The substance of PGR's transactions with Third Birkenhead in 1968 and Sixth Birkenhead in 1977, as we view the facts, was an arrangement for the permanent financing of the Yakima facility improvements installed by PGR on property on which it held a lease. The lease, with its renewals, would extend beyond the useful life of the improvements. With its own funds, PGR, before and during 1975 and 1976, bought and paid for the improvements on which it here claims depreciation deductions. As contemplated by the 1968 lease provisions summarized in our findings, PGR turned to Cushman, who acted as Englestad's representative, for the arrangement of permanent financing for the cost of the improvements as well as the balance remaining on the 1968 Third Birkenhead note. Under the terms of the 1977 arrangement made with the insurance company lenders, Englestad paid PGR nothing, incurred no personal liability for either the interest or the principal of the loans obtained for this purpose, and made no payments thereof. The notes the he signed on behalf of Sixth Birkenhead contained an express provision that the lenders would look solely to the property *556 and to the sums due from PGR under the lease. PGR, on the other hand, was required to, and did, become liable on the notes "as a principal and not as a surety or guarantor" and agreed to pay the installments "as and when the same shall become due and payable." It thereby exposed its financial future to this $ 3,000,000 risk. PGR has, in fact, paid the principal and interest installments directly to the insurance companies, nominally in the form of rent. These facts demonstrate that the relationship between Englestad and PGR was not in the language of Frank Lyon Co. v. United States, supra at 584, that of the traditional lessor-lessee. The economic reality is that the obligation to pay the notes covering the cost of the facility fell squarely on PGR, the ostensible lessee, and not on Englestad, the title holder of the property. As we read the Frank Lyon opinion, Frank Lyon's liability as principal for the payment of the notes to finance the construction of the building was a most significant factor in the Court's decision. The Court stated (435 U.S. at 576-577): Here * * *, and most significantly, it was Lyon alone, and not Worthen, who was *557 liable on the notes, first to City Bank, and then to New York Life. Despite the facts that Worthen had agreed to pay rent and that this rent, equaled the amounts due from Lyon to New York Life, should anything go awry in the later years of the lease, Lyon was primarily liable. No matter how the transaction could have been devised otherwise, it remains a fact that as the agreements were placed in final form, the obligation on the notes fell squarely on Lyon. Lyon, an ongoing enterprise, exposed its very business well-being to this real and substantial risk. [Frn. refs. omitted.]
The Court added (at 580-581): As has been noted, the obligations on which Lyon paid interest were its obligations alone, and it is entitled to claim deductions therefor under [section] 163(a) * * *. As is clear from the facts, none of the parties to this sale-and-leaseback was the owner of the building in any simple sense. But it is equally clear that the facts focus upon Lyon as the one whose capital was committed to the building and as the party, therefore, that was entitled to claim depreciation for the consumption of that capital. * * *
True, in real estate transactions, nonrecourse *558 notes like the ones signed by Sixth Birkenhead, Englestad's assignor, are not unusual; where no one has personal liability for the obligation reflected by such notes, they are regarded as a neutral factor in seeking the substance of a sale and leaseback transaction. Hilton v. Commissioner,74 T.C. 305, 363 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). In the instant case, however, the teaching of the Frank Lyon opinion requires us to give significant weight to PGR's liability as principal on the indebtedness to the insurance company lenders and to the absence of any such liability on Englestad's part. 2. Benefits and Burdens of Ownership
The economic realities are that Englestad never acquired an equity ownership interest in the Yakima facility and PGR, rather than Englestad, retained the primary benefits and burdens of ownership associated with the facility. [12] We recognize, in this regard, that Englestad acquired legal title to the Yakima facility and improvements through the 59th Property Associates and Sixth Birkenhead transactions; however, depreciation is not based on legal title but on an actual equity investment in property. *559 Helvering v. Lazarus & Co.,308 U.S. 252, 255 (1939); Estate of Franklin v. Commissioner,544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hilton v. Commissioner,74 T.C. at 350; sec. 1.167(a)-4, Income Tax Regs.
*560 The parties do not dispute that Englestad's cash payments in the sale-leaseback transactions [13] went to Cushman and Young as fees for their services in arranging the transactions, which, as we shall discuss, were designed to provide Englestad with a tax shelter. None of the cash was paid to PGR for the purchase of the property or improvements. Indeed, Englestad's payments were deducted by him on his income tax returns. Such payments do not constitute an equity investment for the purposes of this case. See Hilton v. Commissioner,74 T.C. at 359-360. Respondent argues that Englestad acquired an equity in the property as a result of the mortgage payments made during the period between 1969 and 1977. Respondent computes this equity as of 1977 at $ 93,485, which represents the *561 difference between the original $ 500,000 sale and leaseback price and his computation of the 1977 balance of $ 406,515 remaining unpaid on the mortgage note at that time. In making this argument, respondent completely ignores the wear and tear of the property through its continued use by PGR from 1969 through 1977. The record does not disclose the 1977 value of the facility, but it contains a projection showing that the property depreciated at a rate of $ 15,396 per year for each of the years 1969 through 1976. The depreciation thus exceeded the mortgage reduction. The same pattern continued in the post-1977 years. Even if Englestad had acquired such an equity, however, he could realize nothing from it because he could not terminate the lease. By the time the lease expires, the useful life of the facility will be exhausted. Thus, the principal payments on the notes cannot be said to produce for Englestad any equity in the facility. Furthermore, PGR, rather than Englestad, retained the significant burdens associated with ownership of the Yakima facility. First, in the event of condemnation, casualty loss, or economic abandonment, PGR could not terminate the lease but was required *562 under provisions in the original 1968 lease (which remained unchanged by the 1977 amendments) to pay to the lessor a price specified under lease Schedule C, a formula price designed to approximate the then outstanding mortgage balance. Thus, PGR remained entirely at risk with respect to any reduction in the value of the property in such circumstances. Englestad, on the other hand, bore no economic risk; in the event of any loss or damage to the property, the notes would be paid off by PGR and Englestad could walk away from the transaction. PGR also bears risk of excess depreciation of the property. As noted above, Englestad made no equity investment and has none to lose. PGR, on the other hand, is required under the amended lease to pay the lessor in 1997 the greater of the Schedule C price (essentially equal to the balloon payments due on the notes in that year) or the fair market value of the property as encumbered by the lease (irrevocable purchase offer). Thus, if the facility has depreciated at the expiration of the primary term to the point where its fair market value is below the unpaid balance remaining on the insurance company loans, PGR remains obligated under *563 the terms of the lease to purchase the property from the lessor for a price sufficient to pay off the notes. [14]
Moreover, Englestad bears no risk of loss even if PGR defaults on rent payments applied to the discharge of the notes secured by the Yakima facility. Under the 1977 mortgage and indenture, the trustees for the insurance company lenders agreed with Englestad to look to the property alone in the event of default on the loan payments; Englestad was thus exempted from any personal liability by section 11.1 of the indenture. [15] While use of nonrecourse indebtedness is not uncommon in sale-leaseback arrangements and is a neutral factor in a determination of whether a transaction has economic substance, [16] the instant arrangement has the added twist. As discussed above, *564 pursuant to the 1977 indemnity agreement, PGR covenanted to the insurance company lenders that it would pay the amounts owed pursuant to the promissory notes executed by Sixth Birkenhead. PGR further agreed that its liability was that of a principal and not as a surety or guarantor. Thus, PGR assumed most, if not all, of the burdens of economic risks normally associated with the ownership of property; risk of excess depreciation in the value of the property; and liability as principal for the loans used to pay for the depreciable property in dispute. PGR has no right to terminate *565 the lease and escape those burdens. Englestad, on the other hand, was immunized from any personal liability on the notes and protected from the risk of economic loss through buy-out provisions in the lease. At the same time, PGR enjoys the benefits associated with ownership of the property. The long-term leases provided PGR with possession of the Yakima facility for 59 years (1968-2027), assuming it exercises the optional extended terms of the 1977 amended lease, during which time PGR will have almost complete control over the property. Under the leases, PGR could alter the property, build or remove improvements to the property, or sublet the premises. See Estate of Thomas v. Commissioner,84 T.C. 412, 436 (1985). 3. Economic Substance
Respondent contends that the sale-leaseback transactions gave Englestad an equity investment in the property because, he urges us to find, Englestad had a reasonable opportunity for eventual economic profit from the transaction without regard to the tax benefits. The rental payments exceeded the mortgage payments by only an insignificant amount, which was totally absorbed by miscellaneous expenses. The only opportunity *566 for Englestad to profit would, of necessity, be derived from the value of the rent payable after the notes (including the balloon payments) to the lenders have been paid, the offer PGR was required to make in 1977, or the reversion in 2027 at the end of the lease period. We do not think any such reasonable opportunity existed. Under the provisions of the lease, as amended in 1977, the rent payable after 1997 will be greatly reduced. PGR is required to make an irrevocable offer to purchase the Yakima facility from Englestad on August 31, 1997, for a price equal to the greater of the Schedule C purchase price (equal to the outstanding balance of the indebtedness on that date) or the fair market value of the property as encumbered by the lease as extended for an additional 30 years through the year 2027. Englestad can reject the offer only with the consent of the insurance company lenders. On September 1, 1997, balloon payments of $ 404,199.62 will be due. In view of PGR's obligations to the insurance company lenders and PGR's financial standing, the insurance companies will almost certainly require Englestad to accept PGR's offer unless Englestad were to pay off the balloon payments *567 due on the notes. Petitioner and respondent each rely on the testimony and reports of expert witnesses to demonstrate the presence or absence of economic opportunity for gain aside from tax benefits from Englestad's point of view. In our findings we have described briefly the qualifications of these experts and the conclusions they reached. We now briefly examine the analysis made by each expert witness. Respondent's expert, Kimmel, began his analysis with several basic assumptions: (1) PGR will exercise all six 5-year extended terms of the lease beginning in 1997; (2) PGR will not purchase the Yakima facility from Englestad in 1997; (3) the lessor will receive no income pursuant to either the 1968 or 1977 lease until the balloon payments, due in 1993 and 1997, respectively, are paid; and (4) the Yakima facility will have no residual value at the end of the extended lease period. Kimmel conducted his analysis on what he termed a "before-tax" basis. In making his calculations of the value of the rent receivable under the lease compared with the balloon payments, Kimmel first computed the present value on June 1, 1993 (balloon payment due date) of the quarterly lease payments *568 due during the extended terms of the 1968 lease agreement and the present value on September 1, 1997 (balloon payment due date) of the reduced quarterly lease payments due during the extended terms of the 1977 amended lease agreement. Kimmel figured the 1997 present value of each set of lease payments at 10-percent and 12-percent discount rates. [17]
Kimmel next subtracted from the discounted stream of lease payments the balloon payments [18] due in 1993 and 1997 on the 1968 and 1977 notes, respectively. The excess rental payments over the balloon payments pursuant to the 1977 transaction was discounted to June 1, 1993, the date the balloon payment on the 1968 note was due. Then, subtracting from that figure the excess *569 rental payments over the balloon payment pursuant to the 1968 transaction produced an amount representing the "excess of the net income * * * over the original 1968 lease." this excess amount was discounted to June 1, 1977 indicating the present worth of the economic gain on the 1977 transaction at the time of investment. After subtracting the initial cash investment in 1977 of $ 9,594, [19] Kimmel concluded that the lessor's position would realize a net economic gain before any tax consideration of $ 32,394 at a 10-percent discount rate and $ 11,824 at a 12-percent discount rate. *570 Kimmel admitted, however, that his computations are based on a $ 5,000 balloon payment smaller than the actual amount that will be due in 1997 and that this correction reduces his net gain figure by $ 500 to $ 700 (see n. 19, supra). Also, he failed to take into account the $ 20,000 Englestad paid Cushman and Young as a fee in connection with the 59th Property Associates transaction (see n. 2, supra). When these two adjustments are made, Kimmel's potential gain figure computed at a 10-percent discount rate is reduced to $ 12,394 and at 12-percent discount rate is extinguished. Steichen's analysis, introduced on behalf of PGR, was based on the following assumptions: (1) the improvements on the facility will be fully depreciated for tax purposes by 1997, (2) the lessor is in the 70-percent income tax bracket, and (3) the lessor is at higher risk in the investment than the holder of a second mortgage. Steichen reasoned that the lessor would accept the lessee's offer to purchase the property in 1997 when the balloon payments become due, but would not accept the purchase price set by the formula in the lease schedule, as it closely approximated the balloon payments leaving *571 the lessor with virtually no gain. Thus, Steichen's calculations are based on the conclusion that the lessor would use the alternative valuation method under the lease and sell the property to the lessee for its fair market value as encumbered by the lease as extended through the year 2027. In appraising the fair market value of the property as encombered by the lease, Steichen calculated the present value in 1997 of the rental income stream from the amended lease during the 1997-2027 extended terms, using a 15-percent discount factor. He added to this value the present value in 1997 of what he treated as the residual land value in the year 2027, again using a 15-percent discount factor. From this sum the cost basis of the land was subtracted and the capital gains tax applied to the remainder. Finally, the basis in the land was added back, producing a value in excess of the balloon payments due in 1997 in the amount of $ 20,100. Steichen then discounted this excess value at a 15-percent discount rate to 1977, producing an "economic gain" to the lessor of $ 1,228. With or without making this discount from 1997 to 1977, Englestad's cash commission payments to the agents in the *572 transactions ($ 20,000 in 1968 and $ 9,594 in 1977) exceeded his potential for gain. Thus, according to the experts, Englestad can realize a gain, at some point 29 to 59 years after the 1968 deal was made, only if a much debated low discount rate is used in making the economic projections. From the evidence, we are convinced that Kimmel's 10-percent discount figure cannot be justified. Economic studies for Englestad were made, however, only for the purposes of this trial. The promoters who sold Englestad this deal gave him only projections of the tax benefits he was to receive and, as we shall discuss, those anticipated tax benefits induced him to make the deal. Even if we were to hold that he is entitled to the interest and expense deductions for the years in dispute, we are convinced that he would find a way to get rid of the Yakima facility as soon as the shelter "burns out," i.e., when the taxable rent exceeds the interest and depreciation deductions. His net tax on this "phantom" income would exceed any gain he could thereafter hope to realize. The theoretical possibility of a small gain, under the unrealistic low discount scenario, de minimis in relation to the amounts *573 involved in the transaction, does not, in our judgment, show that this transaction had economic substance, i.e., that Englestad acquired an equity investment in the property. 4. Business Purpose
As to possible "tax-independent considerations" specified by Frank Lyon Co. v. United States,435 U.S. 561, 583-584 (1978), it is clear from the record in this case that, from Englestad's viewpoint, the 59th Property Associates and Sixth Birkenhead transactions were structured solely to provide the tax avoidance features inherent in the arrangement. The record does not reveal why PGR entered the sales-leaseback arrangement instead of dealing directly with the lending institutions. It is clear, however, that PGR needed financing for the Yakima facility which it used in its on-going business and that the arrangement provided the financing it needed.[20] From PGR's standpoint, the financing arrangement served an important business purpose.
*574 With regard to his participation in 59th Property Associates, Englestad was initially approached in 1969 by Bowman, who was engaged by Young to sell tax sheltered investments. At that time, Englestad was interested in obtaining an immediate tax shelter. His decision to invest in 59th Property Associates was based entirely on two brief meetings with his accountant and Bowman and written projections of tax losses expected on the properties. [21]
At the time he made the investment, Englestad had not seen any of the properties and was not told the addresses of the properties. Up to the date of the trial he had not seen the properties even though he had inspected every other piece of property he owned. Englestad did not request or obtain appraisals of the properties, title reports, or copies of financing documents covering the transaction. Indeed, the entire 59th Property transaction was designed to provide Englestad with the maximum income tax write-off. Englestad *575 was guaranteed a 3.5 to 1 tax write-off and was assured that if the transaction did not hold up the properties would be repurchased from him. When he found that the tax write-off was only a 3-to-1 ratio, [22] he complained to Bowman and Young about the amount of depreciation he had purchased and requested recalculations of write-offs based on various depreciation methods. He finally settled the dispute over the anticipated deductions by trading his claim against Cushman and Young for their 1-percent interest in 59th Property Associates. Englestad's involvement in the Sixth Birkenhead transaction was no more extensive than in the 59th Property transaction. PGR, pursuant to the clause in the lease permitting the lessee to make improvements to the Yakima facility, proceeded in 1975 to construct almost $ 2.6 million in improvements and additions. PGR provided the interim financing and later contacted Cushman for the purpose of obtaining permanent financing. With regard to financing the improvements and refinancing the outstanding balance on the *576 original 1968 loan, PGR and its law firm dealt only with Cushman. Cushman obtained the financing from the insurance company lenders and negotiated with PGR as to interest rates and rental payments. Englestad was not consulted with respect to the expansion of the Yakima facility; in fact, he did not become aware of the expansion until after it had begun. Englestad was not involved in negotiating the terms of the permanent financing or the lease amendments. Furthermore, Englestad did not actively participate in the incorporation of Sixth Birkenhead, a corporation formed solely to facilitate the 1977 sale and leaseback transaction; he did not even know who was responsible for its incorporation. Respondent emphasizes Englestad's testimony that he was motivated to invest in 59th Property Associates at least in part because he thought the properties would appreciate in value. However, his belief was not based on a realistic evaluation of the properties' appreciation potential because, as stated above, Englestad had never seen the properties, had never requested an appraisal of the properties, and, prior to his investment, did not even know where the properties were located. Furthermore, *577 as explained above, Englestad never paid PGR anything; he paid only fees or commissions to the tax shelter promoters. See Dunlap v. Commissioner,74 T.C. 1733, 1437 (1980), revd. and remanded on another issue 670 F.2d 785 (8th Cir. 1982). Englestad also testified that with respect to the 1977 Sixth Birkenhead transaction he evaluated the lease provisions in his head and concluded that he could expect a 20-percent return on his investment from rental income; however, he admitted that he made the evaluation not before entering the deal but only after signing the documents. Moreover, nothing the record supports this subjective evaluation. In fact, Englestad's own testimony stronly indicates that his 1977 investment was motivated solely by expected tax benefits: Q. At the time that you entered into the 1977 transaction, did you ever conceive, or think it possible, that you would not be entitled to the tax benefits such as depreciation? A. No. If I had, I would've been a real fool, 'cause I donated $ 10,000 to the cost of putting this thing together. I could just as well have gone over to that window and thrown $ 10,000 out the window.
Thus, *578 we conclude that the sale-leaseback transaction provided PGR with financing for its Yakima facility. As to Englestad, the sale-leaseback transactions had no economic, commercial, or legal purpose other than the hoped for favorable tax consequences flowing therefrom. See Falsetti v. Commissioner,85 T.C. 332, 354 (1985). [23]
5. Conclusion
We hold that PGR is *579 entitled to the disputed depreciation and interest deductions. To reflect the foregoing, Decision will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
2. The total purchase price for the 59th Property Associates properties was $ 3,082,830, figured as follows: Third Birkenhead
$   500,000
Second Birkenhead
850,000
Fifth Cheltenham
1,732,830
$3,082,830
The purchase price of the Yakima facility (Third Birkenhead) was $ 500,000, approximately 16 percent of the total purchase price. Thus, we find that 16 percent of Englestad's $ 125,000 investment in 59th Property Associates ($ 20,000) is properly allocable to the Yakima facility. ↩
3. Each note expressly provided, among other things, that "the registered owner of this Note agrees to look solely to the Trust Estate and to the sums due and to become due under the Lease for the payment of any such sum." ↩
4. The balloon payments on each of the notes to the insurance company lenders are as follow: ↩
Note
Balloon
Series A
$   4,651.46
Series B#1
239,729.62
Series B#2
159,818.55
$ 404,199.62
5. The amended lease and memorandum of lease provided for the following periodic rental payments during 1977, the initial year of the amended lease: June 2, 1977 -- June 28, 1977
$  2,375
June 29, 1977 -- Aug. 31, 1977
$ 50,700
Sept. 1, 1977 -- Nov. 30, 1977
$ 69,585
The quarterly rental payments of $ 80,050 apply to the period from Dec. 1, 1977 to May 31, 1993. ↩
6. Additional information on Steichen may be found in Hilton v. Commissioner,74 T.C. 305, 336-337 (1980), affd. per curiam 671 F.2d 316↩ (9th Cir. 1982). 7. Shortly before this case was tried, Englestad filed a petition alleging his entitlement to the disputed depreciation and interest deductions. Englestad v. Commissioner,↩ docket No. 37234-86. Because of delays in completing the Englestad audit, the two cases could not be consolidated for trial. 8. PGR and Englestad elected on Sept. 1, 1978, to treat PGR as the purchaser of the Yakima facility for purposes of the investment tax credit. Sec. 1.48-4, Income Tax Regs.↩ The availability of that credit is not at issue here. 9. This is an area of the tax law in which "formal written documents are not rigidly binding." Helvering v. Lazarus & Co.,308 U.S. 252, 255 (1939). However, respondent seeks to invoke the rule of Commissioner v. Danielson,378 F.2d 771, 775 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965), which, he argues, would permit petitioner to challenge the form of the title transfer to Sixth Birkenhead and then to Englestad "only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." This Court has not adopted that rule but has followed what is referred to as the "strong proof" rule. See Ullman v. Commissioner,264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Schultz v. Commissioner,294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). In this case, a whipsaw situation, respondent is, in a sense, a stakeholder, having taken alternative positions in this case and in Englestad v. Commissioner, docket No. 37234-86. Although Englestad has not formally agreed to be bound by the outcome of this case, he testified at length as a witness called by the Commissioner, paid the fee for the services of the Commissioner's expert witness, and otherwise cooperated in the presentation of the Commissioner's case. Had Englestad's case gone to trial first, he would have had the burden of proof. Given these facts and the Commissioner's alternative determinations, the preponderance of the evidence rule, giving due weight to the form in which the transaction is cast, would seem appropriate. See Coleman v. Commissioner,87 T.C. 178, 201-202 (1986), and cases cited; cf. Major v. Commissioner,76 T.C. 239, 249-247↩ (1981). We add, however, that, as we view the facts, the conclusion we reach in this case is supported by strong proof. 10. In Frank Lyon Co. v. United States,435 U.S. 561, 572-573 (1978), the Court stated some of the guiding legal principals as follows: In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. [Citations omitted.] In applying this doctrine of substance over form, the Court has looked at the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers" [citations omitted] as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co.,308 U.S., at 255↩. * * * 11. The Supreme Court in Frank Lyon Co. v. United States, supra, summarized the factors to be considered in sale and leaseback cases as follows (435 U.S. at 583-584): In short, we hold that where, as here, there is a genuine multiple party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. It suffices to say that, as here, a sale-and-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions. ↩
12. In Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981, we enumerated certain factors which are relevant in determining whether a sale has occurred: (1) whether legal title passed; (2) whether the parties treated the transaction as a sale; (3) whether the alleged purchaser acquired an equity in the property; (4) whether the contract of sale creates a present obligation on the purchaser to make payments; (5) whether the purchaser is vested with the right of possession; (6) whether the purchaser pays property taxes following the transactions; (7) whether the purchaser bears the risk of loss or damage to the property; and (8) whether the purchaser receives the profits from the operation and sale of the property. We note, however, that some of the above factors are less applicable to the instant case because the transaction in that case did not involve a sale-leaseback arrangement. See Torres v. Commissioner,88 T.C. 702, 721↩ (1987). 13. Englestad paid $ 125,000 in 1969 in acquiring his interest in 59th Property Associates of which Cushman received $ 80,000 and Young received $ 48,200 for services rendered. Pursuant to the 1977 Sixth Birkenhead transaction, Englestad paid $ 9,594 to Cushman as one-half of his fee; the other half was paid to Cushman by PGR. For an allocation of these payments, see n. 2, supra.↩
14. While the converse may also occur (the fair market value of the property exceeds the Schedule C price), as explained below, the duration of the remaining extended terms of the lease coupled with the lower rent payments encumbering the property make it unlikely that the fair market value of the property encumbered by the lease in 1997 will exceed the balloon payments plus Englestad's cash investment. ↩
15. Respondent argues that by executing an assumption agreement in connection with the 1977 transaction in which they purportedly assumed the obligations of Sixth Birkenhead under the indenture, the Englestads became personally liable on the notes. However, the assumption agreement merely required Englestad to perform Sixth Birkenhead's obligations and the note owners could "look solely to the Trust Estate and to the sums due and to become due under the lease" for payment.↩
16. Hilton v. Commissioner,74 T.C. 305, 363 (1980), affd. per curiam 671 F.2d 316↩ (9th Cir. 1982). 17. The discount rate applied generally reflects both the risk the investor takes in making the investment and the rate of return he expects from his investment. Kimmel chose the 10 and 12-percent discount rates because, in his judgment, the lessor position in the 1977 Sixth Birkenhead transaction was no riskier than that of a long-term mortgage lender. Rates for long-term mortgages, between 1976 and 1978 were in the 10 to 12 percent range, according to Kimmel. ↩
18. In his report, Kimmel used rental and balloon payment figures provided by Englestad's accountant, Ronald L. Smith. The figure used by Kimmel representing the balloon payments due in 1997 on the notes securing the 1977 Sixth Birkenhead transaction is $ 5,000 less than the actual balloon payments due. Kimmel testified that application of the correct balloon payment figure would result in lowering the net gain by $ 500 to $700. ↩
19. As far as we can ascertain, the record does not show whether Englestad deducted this $ 9,594 (fee paid to Cushman for arranging the financing) as he did the fees paid Cushman and Young on the 59th Property transaction. ↩
20. Good business reasons for participating in a sale-leaseback transaction demonstrated by the seller-lessee does not require respect for the form of the transaction where the buyer-lessor's investment lacked a good business purpose. See Hilton v. Commissioner,74 T.C. at 374-348↩. 21. Bowman testified that in his meetings with Englestad with regard to 59th Property Associates, only the tax aspects of the deal were discussed and recalled no mention of possible gain on the investment in later years. ↩
22. The factors in this ratio are Englestad's anticipated depreciation deductions and the fees Englestad paid to Cushman and Young. ↩
23. We have, for purposes of our analysis, treated the 1969 59th Property and the 1977 Sixth Birkenhead sale-leasebacks as one transaction. The original 1968 lease was still in effect in 1975 when PGR began to construct improvements on the property in accordance with provisions in the lease permitting it to do so. Pursuant to the Sixth Birkenhead transaction, the original lease was extended and only a few provisions were amended. In addition, the principal balance remaining on the 1968 note was refinanced as part of the 1977 loan from the insurance company lenders. We think the 1969 59th Property transaction (successor) to the original 1968 sale-leaseback) was, in effect, extended in 1977 pursuant to the Sixth Birkenhead transaction, and we do not understand the parties to contend otherwise. ↩