LEE E. BARKLEY AND CYNTHIA M. BARKLEY, RICHARD G. MARTIN AND HELEN L. MARTIN, BARTON BUNTING AND CONSTANT BUNTING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barkley v. Commissioner
Docket No. 8541-83.
United States Tax Court
T.C. Memo 1987-577; 1987 Tax Ct. Memo LEXIS 580; 54 T.C.M. (CCH) 1126; T.C.M. (RIA) 87577; November 23, 1987. Gregory A. Robinson, for the petitioners. Stephen J. Waller, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioners' income taxes and additions to tax as follows: Sec.
Sec.
Petitioners
Year
Tax
6653(a)
6651(a)
Lee E. and Cynthia M. Barkley
1979
$  2,617.00
$ 130.85
1980
5,882.00
294.10
Richard G. and Helen L. Martin
1978
15,074.50
1,449.50
$ 753.73
1979
9,581.92
479.10
Barton and Constant Bunting
1979
2,451.00
122.65
1980
3,250.00
162.50
This is a proceeding for redetermination of deficiencies arising out of petitioners' purchase of Master Films concerning space and space exploration. The issues for consideration are: (1) Whether petitioners' Master Films venture was an activity engaged in for profit; (2) whether petitioners' assets were placed in service during the years claimed; (3) whether the basis of the Master Films includes certain "chameleon" promissory notes; (5) whether petitioners were "at risk" with respect to these promissory *582 notes; and (6) whether petitioners are liable for section 6653(a)[1] additions to tax. FINDINGS OF FACT This consolidated action involves the tax consequences of petitioners' purchase of Master Films during the years 1978, 1979 and 1980. The parties have settled other disputed issues. At the time of filing their respective petitions herein, all petitioners resided in Arizona. The stipulated facts and exhibits are incorporated herein by reference. Donald Clark first approach his brother, William Clark, in 1976 or 1977 about putting together a series of Master Films. A Master Film consists of a series of slides and an accompanying script. From the master, duplicate slide sets or filmstrips are made that can be sold for educational purposes to schools and other organizations. William Clark's interest in astronomy, and research indicating an expanding educational market, led to production of a series of Master Films about space. William Clark's background includes 3 years *583 of journalism school at San Diego State University. He did not obtain a degree. After college he worked for his father's company in marketing, consulting and design. His duties included preparing presentations, including slide presentations similar to petitioners' Master Films, for several Fortune 500 companies. Charges for these "custom" presentations ranged from $ 15,000 to $ 25,000. This price was a 30 to 35-percent markup over the cost of production. In 1976, he commenced taking courses in astronomy, physics and mathematics at Drew University. Prior to entering the Master Film venture he had no experience in educational filmstrip marketing. William Clark and Ralph Heigl, a photographer, produced the Master Films. Clark and Heigl produced many of the master slides that required original artwork and photography, including illustrations and diagrams. Clark purchased some photographs. Other photographs, in the public domain, were culled from the collections of the National Aeronautics and Space Administration. William Clark and, among others, Dr. Jay Pasachoff, a noted astronomy textbook author, and Dr. Robert Fenstermacher, a professor of physics at Drew University, collaborated *584 on scripts for the series. Kenneth Reiley, a newspaper editor, and his wife, a reading specialist, further edited the scripts. Reiley did not charge for his services, which were worth $ 100 to $ 200 per hour. Due to their high quality and the timelessness of the information contained therein, the estimated life expectancy of the Master Films is between 15 and 20 years. When completed Donald Clark, on behalf of Clark Financial Corporation (CFC), purchased each Master Film for a price ranging from $ 2,500 to $ 3,000, an amount that covered the costs and expenses of producing the film. The master folder for each slide set was created in 1977. Ads for sales of filmstrips and slide sets first appeared in Astronomy magazine in 1978. Petitioners [2] first became involved in the Master Films venture through Donald Clark. Clark was a business associate of petitioners Barkley and Bunting. Petitioner Martin heard about the program through business associates that had invested. Prior to investing, petitioners received "Proposal for educational audio/video aids" (prospectus) and other materials from CFC, which they relied upon in making their investment. [3] These included brochures, *585 an opinion regarding the tax consequences of the venture, and two appraisals. The prospectus warned that only a small percentage of educational films generated receipts large enough to pay the purchase price or return a profit to the owners. Petitioners did not obtain independent appraisals of the films before investing. Their occupations did not involve the acquisition of distribution of films, nor did they make any other investments in Master Films. Petitioners did not subscribe to any materials involving Master Films. Petitioners have not viewed their Master Film in their entirety. Petitioners contact about the purchase was with Donald Clark, not William Clark. The name and purchase price of each Master Film acquired by petitioners is shown below: Petitioner
Year
Title
Price
Martin [4]
1978
"Our Solar System"
$ 39,000
Martin
1979
"Mercury and Venus: The
25,000
Twilight Planets"
Bunting
1979
"Viewpoint Earth"
25,000
Barkley
1979
"Mercury and Venus: The
15,000
Twilight Planets" [5]
Barkley
1980
"Cosmogony Motions"
25,000
*586 The purchase of the Master Films occurred at or near the end of the taxable years involved. The purchase agreements were all similar or identical in form. All required a down payment of 10 percent of the purchase price. In each of petitioners' cases, this involved a cash down payment and, in some cases, a promissory note to Donald Clark for the remainder of the down payment. Other portions of the agreement read in pertinent part, as follows: Agreement * * * between Clark Financial Corporation, an Arizona corporation, hereinafter referred to as "CFC", and [petitioner] * * *. * * * 2. Buyer acknowledges that CFC has disclosed to Buyer that the filmstrips offered for sale herein are or may be derivative works from other filmstrips authored by Clark/Heigl and Associates. Buyer is aware that each filmstrip subject is broken down into four related filmstrips directed at various education levels * * *. In addition, petitioners and CFC entered into a "Master film purchase and security agreement" (purchase agreement), which read in pertinent part as follows: "Master *587 Film" shall mean a slide and audio cassette program from which the molds or permanent manufacturing agents can be made for use in the manufacture of films, filmstrips, video cassettes, video tape or motion pictures. * * * * * * 1. The purchase price of the Master Film * * * is * * * with an initial down payment of [10%] cash payable on execution of this Agreement and the balance to be evidenced by a promissory note * * * with interest at the rate of 6% per annum, secured by a security interest and general lien * * * upon the Film Rights * * * and payable in installments as follows: on each of the first six annual anniversaries of the date of execution of the note * * * $ 100 * * * with the remaining principal and accrued interest, if any, due and payable seven years from the date of the note. 2. The buyer hereby assigns * * * the seller all rights to receive the net proceeds * * * as follows: A. Until [the note is paid] 70% of the net proceeds from exploitation * * *. * * * 3. After the initial seven year term of the note, if the principal balance of the note, plus any accrued interest, has not been paid in full, the buyer shall have the right to renew the note *588 for two additional consecutive seven year periods * * *. * * * B. * * * Each new note shall bear interest at the rate of 6% per annum [and] shall be without recourse to other assets of the buyer * * *. The agreement allowed petitioners a choice of distributors. Petitioners failed to make the $ 100 payments required under the purchase agreement until sometime in 1984 or 1985. Concurrent with the purchase agreement, petitioners entered into a distribution agreement with Summit Distributors (Summit), William Clark's company. This, in effect, provided that the distributor had the right to market and distribute the master, with wide latitude as to the medium and methods used. Summit agreed to pay petitioners 30 percent of the gross sales price of each program sold. If the program was leased Summit agreed to pay petitioners 80 percent of the net proceeds. Any proceeds due petitioners were subject to assignment to CFC under the purchase agreement. Petitioners could terminate the agreement if a minimum sales figure was not reached. Although Summit did not achieve this figure, petitioners did not terminate the agreement. The Master Films never left the offices of William *589 Clark in New Jersey. Despite William Clark's efforts, the marketing of petitioners' Master Films, in a conventional format, filmstrips and slide sets, failed. Through 1981, petitioners received no distributions from their investment, and up to the time of trial had received no or nominal distributions. In addition to marketing efforts, throughout this period Clark constantly updated the master sets, adding and discarding material as he saw fit. [6]
Sometime in 1981 Clark began to explore other media for marketing the films. The one chosen was laser videodisc. Summit transferred petitioners' distribution agreements to Video Vision Associates (Video Vision), another entity headed by William Clark. In May of 1982, Clark notified petitioners of the new medium. In 1984, Video Vision incorporated petitioners' slides in the laser disc "The Sun." This disc was of inferior quality and the slides were subsequently incorporated in a much higher quality disc, "Astronomy." The "Astronomy" disc, and similar ones produced *590 by Clark's company, was highly touted by those in the industry, [7] and by the time of trial Video Vision was approaching profitability. Video Vision spent approximately $ 900,000 developing the video disc technology. The storage capacity of the video disc is very large. Each disc can hold approximately 108,000 still frames. Petitioners' programs were among the total of approximately 35 programs on the disc. Petitioners' master sets were at most 60 frames, most likely less. Any income due petitioners was computed by dividing the number of petitioners' frames used by the total number of frames. A letter from Video Vision to film owners in 1984 provided this projected breakdown: Retail price
$ 10.00
100%
Distribution royalty
4.00
40%
Note income
4.20
42%
Investor income
1.80
18%
$ 10.00
100%
Apparently, $ 10 was each film owner's percentage of the total retail price of the disc. Clark reduced the distribution payment in the original agreement from 70 percent to 40 percent to reflect the lower costs of discs. The note income is 70 percent of the investors proceeds (60 *591 percent) after distribution, assigned to CFC as payment on the 7-year promissory notes. OPINION This case involves the tax consequences of petitioners' purchase of astronomy Master Films. Respondent, in its opening statement, properly characterized petitioners' task as a number of hurdles they must clear in order to legitimize the claimed depreciation deductions and investment tax credits. They must prove, among other things, that the films are tangible, depreciable property, a profit motive, a depreciable basis, and the recourse character of indebtedness used to finance the investment. Petitioners have the burden of proof with respect to these items raised in the notice of deficiency. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). One procedural matter must be dealt with first. Respondent, for the first time in his brief, argues that petitioners did not acquire any interest in the Master Film sets. This issue was not raised in respondent's notice of deficiency, and petitioners were not given the opportunity to present evidence on it at trial. Our consideration *592 of this issue would unfairly disadvantage petitioners. Respondent may not now raise this new issue. Estate of Horvath v. Commissioner,59 T.C. 551 (1973); Leahy v. Commissioner,87 T.C. 56 (1986). In order to take depreciation deductions with respect to an asset, the asset must be used in a trade or business or held for the production of income within the meaning of section 167(a). Similarly, the investment tax credit may be taken only with respect to depreciable property. Sec. 48(a)(1). There is no evidence in the record to indicate that petitioners' activity with respect to the films constituted a trade or business. It was purely investment activity. Higgins v. Commissioner,312 U.S. 212 (1941). Thus, petitioners must prove that the Master Films were held for the production of income. Regarding this requirement, we said in Beck v. Commissioner,85 T.C. 557, 569-570 (1985): Essential to such a showing is a demonstration *593 that petitioner had "an actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1974). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. * * *. "Profit" in this context means economic profit, independent of tax savings. Herrick v. Commissioner [85 T.C. 237 (1985)]; Surloff v. Commissioner,81 T.C. 210, 233 (1983). Whether petitioner possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985) [affd. 782 F.2d 1027 (3d Cir. 1986)], and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioner's mere statement of his intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); *594 Engdahl v. Commissioner,72 T.C. 659, 666 (1979); sec. 1.183-2, Income Tax Regs. * * * [Fn. ref. omitted.] In assessing whether a taxpayer has a profit objective, the regulations under section 183 provide a list of factors to be considered. Sec. 1.183-2(b), Income Tax Regs. These are not, however, directly applicable to this case. This is because petitioners were not directly involved with the Master Film marketing and distribution activity. Rather, petitioners relied on Donald and William Clark and were merely passive investors. In this situation, the standard in Flowers v. Commissioner,80 T.C. 914, 932 (1983), is the correct one: In such case, [the taxpayer] can rely upon the expertise of third parties by contractually assigning most of the normal duties and responsibilities associated with the income-generating operations to such parties. * * * However, the profit motive issue must still be assessed from the perspective of [the taxpayer]. Thus, where [the taxpayer] is virtually passive *595 in its operations, the prudence it exercises in acquiring property and in assigning duties to third parties, and the care with which it oversees the performance of such duties are of heightened importance. [Fn. ref. omitted.] The standard in Flowers was applied in Beck v. Commissioner, supra. We hold that the facts in the instant case are not sufficiently distinguishable from those in Beck and that petitioners have not shown a profit objective in the Master Films venture. In addition, even if a profit objective could be demonstrated, there are a number of other legal and factual impediments to most, if not all, of the claimed deductions and credits. The first part of the Flowers standard is the care used in the acquisition of the property. In Beck, a promoter (CPI) purchased manuscripts for children's books and subsequently arranged for distribution of the books through a publisher. CPI then sold all of its rights in the manuscripts to investors. The purchase price for the manuscripts was $ 130,000, a $ 30,000 down payment and $ 100,000 financed by a 6-percent nonrecourse note. The investor was entitled to receive 27.5 percent of the gross *596 receipts from sales of the book subject to assignment of 50 percent of that amount as payment on the nonrecourse note. The offering memorandum provided by CPI to investors asserted: (1) That the investment was available only to a purchaser with a certain net worth and in the 50-percent tax bracket; (2) the highly speculative nature of the investment in children's books; and (3) the general downturn in the market caused by cuts in spending. An opinion letter detailing the tax consequences, a document summarizing potential tax benefits and cash flow, and an appraisal prepared using preliminary figures provided by CPI accompanied the offering memorandum. The summary document assumed no economic return after 2 years. The taxpayer's tax advisor reviewed this offering material and recommended the investment in a letter dealing primarily with its tax shelter aspects. The taxpayer did not read the book before investing, did not obtain an independent appraisal, and neither the taxpayer nor his advisor knew anything about the publishing industry. The Court questioned the appraisal, recognizing that the offering memorandum noted the primary market was for libraries and schools, while the *597 appraisal valued these sales as only 36 percent of the total. The Collins' appraisal, however, constituted the sole specific economic forecast relating to the investment. It is improbable that [taxpayer and his advisor], both of whom were inexperienced in publishing, would have blindly relied upon an appraisal furnished by the seller, if they had given any serious consideration to the non-tax investment merits * * * particularly in light of the business risks detailed in the offering memorandum. [Beck v. Commissioner, supra at 572.]
The facts are similar, if not more compelling, here. The offering proposal clearly states that "Only a small percentage of all educational films generate receipts large enough to provide funds for repayment of the purchase price of the film and produce a profit to the owners." A large part of the proposal is dedicated to tax factors and an accounting opinion regarding the tax consequences of the investment.[8] The appraisals furnished by CFC were bare conclusions as to the worth of the films. The facts upon which such appraisals were based and the qualifications of the persons who prepared them were not furnished at trial, *598 and apparently not furnished to petitioners at the time of sale. It was unreasonable for petitioners to rely on such information, even from a trusted business associate. Petitioners' entire case rests on their reliance on Donald Clark for the soundness of the investment and on William Clark for its management. Petitioners did not show that Donald Clark knew anything about the filmstrip industry, except as to preparation of the promotion. A reasonable investor would have requested some sort of economic forecast of return of investment. [9] Petitioners did not testify as to any specifics provided by Donald Clark. Donald Clark, a major figure in this promotion, did not even testify at trial. William Clark's testimony that a 2-percent market penetration would return the investment is not relevant, given the fact that petitioners did not speak to William Clark prior to investing. Petitioners did not produce the other offering brochures they testified to at trial, so that it is impossible to assess their contents. *599 Another relevant consideration is whether the fair market value approximated the purchase price. Flowers v. Commissioner, supra, held that a grossly inflated purchase price raised questions as to the profit motive of the purchaser. See also Fox v. Commissioner,80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Kratsa v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984). The only evidence as to value here was in the appraisals. These were *600 not substantiated in any way. William Clark's testimony regarding the $ 15,000 to $ 25,000 price of his presentations for his father's company is not very relevant, given that they were one-time "custom" presentations for corporate, not educational, clients. Furthermore, the films at issue were much shorter than these presentations. Clark's testimony that there was a 30 to 35-percent markup for these corporate presentations also mitigates against petitioners. Clark testified to approximate costs of $ 3,000 per film, plus the value of Kenneth Reiley's services. With the normal markup, the price falls far short of the proposed purchase price. Another approach to valuation may be used when the interest rate on the indebtedness used to acquire property is less than market rates. See Goldstein v. Commissioner,89 T.C. 535 (1987). The prime lending rates during the years at issue were in the 20-percent range. The promissory notes in the instant case bore interest at 6 percent. The present value of the principal and interest of the 7-year notes, plus the down payment, is only slightly more than 50 percent of the purchase price. We consider this to be a grossly inflated *601 price. In the setting of this case, there is no valid nontax reason for such an inflated price. See Herrick v. Commissioner,85 T.C. 237, 255 (1985). It would considerably lessen the rate of return, lengthen the payback period, and make resale at an economic gain impossible. Cf. sec. 1.183-2(b)(4), Income Tax Regs. It shows at least a lack of prudence on petitioners' part in acquiring the property, and at most a total disregard for any legitimate profit motive. Other evidence, while perhaps not relevant standing alone, raises further questions about petitioners' asserted profit objective. While they nominally had a choice of distributors, without any research petitioners chose Summit. Petitioners did not negotiate or attempt to negotiate the price of the films. Petitioners generally did not view their filmstrips. Further, William Clark did not have prior experience in educational filmstrip marketing. Much time at trial was spent on the merits of the laser videodisc and its applications. However, William Clark did not start to research the idea until 1981, and petitioners were not notified until 1982. Its possible application *602 was not foreseen at the time of purchase. As an evidentiary matter, subsequent events generally may not be used to show profit objective existing at the time of purchase. The amount of occasional profits earned, if any, may be a relevant factor in evaluating whether an activity is engaged in for profit. Sec. 1.183-2(b)(7), Income Tax Regs. This regulation, however, does not help petitioners. Petitioners did not show that Video Vision was, in fact, profitable in its videodisc endeavors. Moreover, even if Video Vision was profitable, petitioners did not demonstrate how the venture would be profitable to them. Their programs were among 35 on the disc, 60 still frames among a total of 104,000. We emphasize that profit objective is evaluated from petitioners' standpoint, not William Clark's. Flowers v. Commissioner,80 T.C. 914 (1983). A second part of the Flowers test is the care taken in overseeing the performance of others in directing the business. Even though the films returned no profits for several years, petitioners retained Summit *603 as a distributor. Under the agreement, if minimum sales did not occur, the purchaser had the right to terminate the distribution agreement. Petitioners never did so. Moreover, in spite of the lack of sales petitioners Barkley and Martin purchased another film. "We must conclude that petitioner was a satisfied customer of CPI who received what he wanted from [the book]." Beck v. Commissioner,85 T.C. at 575-576. Petitioners attempt to distinguish Beck in that the only information relief upon in Beck was tax related. Petitioners rely upon the brochures and the two appraisals. They did not produce the brochures at trial and the lack of trustworthiness of the appraisals has already been discussed. Petitioners, in their reply brief, cite optimistic sales projections and figures regarding sales necessary to return a profit as justifications for a reasonable profit opportunity. However, the only citations are to the testimony of William Clark. There is no evidence that petitioners knew of or relied on such projections. We agree with respondent that petitioners have made a case for William Clark being involved in a trade or business for profit. However, *604 they have not met their own burden of proof. Their total passive reliance on the Clark brothers was unreasonable. Their lack of care in supervising duties entrusted to others, even if they are close business associates, evidences a disregard for any economic profit objective. Next, we briefly consider some of the other infirmities in petitioners' position. William Clark testified that the life expectancy of the Master Films was 15 to 20 years, due to the timelessness of the information contained therein. Therefore, petitioners' use of a 7-year useful life is manifestly unreasonable. The nature of the debt used to finance the acquisitions also presents problems for petitioners. Although the promissory notes were technically with recourse to the assets of the buyer, only nominal payments were required for the first 7 years. Payment of these nominal sums was not requested until several years after the notes' execution. After 7 years, the note could be converted at petitioners' option to nonrecourse.[10] Therefore, repayment, if it occurred at all, came from proceeds of the film. The substance of these notes clearly reflect that that they were nonrecourse. Porreca v. Commissioner,86 T.C. 821 (1986). *605 See Gregory v. Helvering,293 U.S. 465 (1935). Petitioners have also failed to substantiate that the fair market value of the films was even close to the stated purchase price. If the purchase price and the principal amount of a nonrecourse note unreasonably exceeds the value of the property acquired, the note does not constitute genuine indebtedness, and cannot be included in the basis of the asset. Elliott v. Commissioner,84 T.C. at 245; Hager v. Commissioner,76 T.C. 759 (1981); Flowers v. Commissioner, supra;Odend'hal v. Commissioner,80 T.C. 588 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984); Brannen v. Commissioner,78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Thus, petitioners' bases in the films do not include the 7-year promissory notes, both for depreciation and investment tax credit purposes. In addition, because the notes were essentially nonrecourse, petitioners were not at risk with respect to such amounts under section *606 465. Sec. 465(b)(4); Porreca v. Commissioner, supra.
Respondent determined additions to tax pursuant to section 6653(a). Section 6653(a) provides that if any portion of any underpayment of tax is due to negligence or intentional disregard of rules and regulations, there will be an addition to tax imposed. Petitioners bear the burden of proof with respect to this issue. Enoch v. Commissioner,57 T.C. 781 (1972). Negligence, within the meaning of section 6653(a), is the lack of due care of failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners argue that they were not negligent because they established the requisite *607 profit motive and the fair market value of the Master Films. We have, however, held to the contrary on both of petitioners' contentions. The purchase price was grossly in excess of fair market value and there was no economic profit objective, only tax considerations. See Snyder v. Commissioner,86 T.C. 567 (1986) (absence of objective support for valuation sustained negligence addition). Petitioners have failed to establish any objective evidence to substantiate the claimed deductions and credits. They have failed to carry their burden of proof. We hold that petitioners are liable for the section 6653(a) additions. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Hereinafter petitioners refer only to petitioners Lee E. Barkley, Barton Bunting and Richard G. Martin. ↩
3. Martin's 1978 purchase differed from the other purchases in that Martin bought from Pacific Coast Productions rather than CFC and used Ascension Films rather than Summit as a distributor. Summit and Ascension Films are the same entity. The prospectuses also differed slightly. ↩
4. Id. ↩
5. This film, apparently, is of a different educational level than Martin's 1979 purchase. ↩
6. William Clark testified that the additions amounted to no more than 5 or 10 percent of the material in the period from production through the trial of this case. ↩
7. Respondent's expert recognized the superior quality of the discs. ↩
8. Petitioners also received a legal opinion on the tax consequences of the transaction from CFC. ↩
9. We are cognizant of possible securities laws limitations on specific economic forecasts in the offering proposal. There is, however, no testimony anywhere, oral or written, concerning projected sales, return on investment or probability of success. The complete absence from the record of such information raises doubts as to asserted economic motivations. ↩
10. Petitioners' testimony that they did not know about the conversion feature is questionable, given their earlier testimony that they were experienced businessmen, and knew the difference between recourse and nonrecourse debt. ↩